# No. 21-3039

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

ANDES PETROLEUM ECUADOR LIMITED,

*Petitioner-Appellee*,

v.

OCCIDENTAL EXPLORATION AND PRODUCTION COMPANY,

*Respondent-Appellant*.

———————————

On Appeal from the United States District Court for the
Southern District of New York, No. 21-3930 (AKH)

———————————

## BRIEF FOR RESPONDENT-APPELLANT
## OCCIDENTAL EXPLORATION AND PRODUCTION COMPANY

———————————

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
JOHN C. BRINKERHOFF JR.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com
*Counsel for Respondent-Appellant*

March 30, 2022

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Respondent-Appellant Occidental Exploration and Production Company is an indirect, but wholly-owned subsidiary of Occidental Petroleum Corporation which owns, indirectly, 100% of its stock.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES...................................................................... iv

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 5

STATEMENT OF THE ISSUES ............................................................. 5

STATEMENT OF THE CASE................................................................. 6

I.     Factual Background ...................................................................... 6

     A.    OEPC's and Andes' Operations in Ecuador ........................................ 6

     B.    The OEPC-Ecuador Arbitration .......................................... 8

     C.    The OEPC-Andes Arbitration .......................................... 10

          1.    Disclosure Requirements in the OEPC-Andes Arbitration Agreement ........................................... 10

          2.    The Arbitration Process and Decision .................................... 14

          3.    Smit, Shore, and Andes' Concealment of a Material Relationship ........................................................... 16

II.    Procedural Background ............................................................... 18

SUMMARY OF ARGUMENT.................................................................. 19

STANDARD OF REVIEW ...................................................................... 24

ARGUMENT .......................................................................................... 24

I.     The Arbitration Award Should Be Vacated For Evident Partiality............... 24

     A.    The FAA and its Evident-Partiality Standard.................................... 24

     B.    Arbitrator Robert Smit Exhibited Evident Partiality.......................... 31

II.    The Arbitration Award Should Be Vacated Because The OEPC-
       Andes Panel Was Not Composed In Accordance With The
       Arbitration Agreement ................................................................. 47

       A.    The Arbitration Award Cannot Be Confirmed Under The
             Convention ........................................................................... 47

       B.    The Arbitration Award Should Be Vacated Under FAA
             §10(a)(4) ............................................................................. 52

III.   In The Alternative, The Court Should Remand For An Evidentiary
       Hearing Or Discovery ..................................................................... 54

IV.    The District Court Awarded Andes Excessive Pre-Judgment
       Interest ........................................................................................... 57

CONCLUSION ................................................................................. 60

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
       LIMITATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013)..................................................................30

*Applied Indus. Materials Corp.*
*v. Ovalar Makine Ticaret Ve Sanayi, A.S.*,
492 F.3d 132 (2d Cir. 2007).................................................. *passim*

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)..................................................................49

*Avis Rent A Car Sys., Inc. v. Garage Emps. Union*,
791 F.2d 22 (2d Cir. 1986).........................................................52

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
850 F.3d 58 (2d Cir. 2017).........................................................47

*Certain Underwriting Members of Lloyds of London*
*v. Fla., Dep't of Fin. Servs.*,
892 F.3d 501 (2d Cir. 2018).................................................. *passim*

*Chen v. Ins. Co. of the State of Pa.*,
163 N.E.3d 447 (N.Y. 2020).......................................................59

*Commonwealth Coatings Corp. v. Cont'l Cas. Co.*,
393 U.S. 145 (1968)........................................... 25, 26, 31, 39

*D.H. Blair & Co. v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006).........................................................54

*Dow Corning Corp. v. Safety Nat'l Cas. Corp.*,
335 F.3d 742 (8th Cir. 2003)......................................................30

*Encyc. Universalis S.A. v. Encyc. Britannica, Inc.*,
403 F.3d 85 (2d Cir. 2005).........................................................48

*Epic Sys. Corp. v. Lewis*,
138 S.Ct. 1612 (2018)......................................... 4, 24, 33

iv

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995)................................................................52

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*,
    552 U.S. 576 (2008)........................................................ 25, 26

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004) .................................... 30, 38, 39

*Koch Oil, S.A. v. Transocean Gulf Oil Co.*,
    751 F.2d 551 (2d Cir. 1985)....................................................40

*Lamps Plus, Inc. v. Varela*,
    139 S.Ct. 1407 (2019)...................................................... 24, 36

*LJL 33rd St. Assocs., LLC v. Pitcairn Prop. Inc.*,
    725 F.3d 184 (2d Cir. 2013) ...................................................40

*Lucent Techs. Inc. v. Tatung Co.*,
    379 F.3d 24 (2d Cir. 2004) .............................................. 31, 44

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) .....................................................24

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..........................................................4, 49

*Morelite Constr. Corp.*
    *v. N.Y. City Dist. Council Carpenters Benefit Funds*,
    748 F.2d 79 (2d Cir. 1984) ............................................. 25, 26

*Nat'l Football League Mgmt. Council*
    *v. Nat'l Football League Players Ass'n*,
    820 F.3d 527 (2d Cir. 2016) ........................................... 28, 29

*New Regency Prods., Inc. v. Nippon Herald Films, Inc.*,
    501 F.3d 1101 (9th Cir. 2007) ...............................................42

*OJSC Ukrnafta v. Carpatsky Petrol. Corp.*,
    957 F.3d 487 (5th Cir. 2020)..................................................49

*Pac. & Arctic Ry. & Navigation Co. v. United Transp. Union*,
    952 F.2d 1144 (9th Cir. 1991) ...............................................39

*Pitta v. Hotel Ass'n of N.Y.C., Inc.*,
806 F.2d 419 (2d Cir. 1986) .................................................. 28, 29, 51

*Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*,
497 F.3d 133 (2d Cir. 2007) ................................................................ 52

*ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l. Life Co.*,
564 F.3d 81 (2d Cir. 2009) .................................................................. 40

*Sanko S.S. Co. v. Cook Indus.*,
495 F.2d 1260 (2d Cir. 1973) .............................................................. 54

*Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*,
668 F.3d 60 (2d Cir. 2012) .......................................................... *passim*

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974) ...................................................................... 32, 49

*Sokolowski v. Metro. Transp. Auth.*,
723 F.3d 187 (2d Cir. 2013) ................................................................ 34

*Sphere Drake Ins. v. All Am. Life Ins.*,
307 F.3d 617 (7th Cir. 2002) ...................................................... 27, 37, 52

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) ........................................................................... 24

*Tatneft v. Ukraine*,
21 F.4th 829 (D.C. Cir. 2021) ...................................................... 3, 49, 50

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*,
363 U.S. 593 (1960) ........................................................................... 52

*Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*,
304 F.3d 1331 (11th Cir. 2002) ................................................. 38, 44, 54, 55

*Westerbeke Corp. v. Daihatsu Motor Co.*,
304 F.3d 200 (2d Cir. 2002) ............................................................... 24

*Williams v. Pennsylvania*,
579 U.S. 1 (2016) .............................................................................. 51

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*,
126 F.3d 15 (2d Cir. 1997) ........................................................48

*Zeiler v. Deitsch*,
500 F.3d 157 (2d Cir. 2007) ......................................................48

**Statutes**

9 U.S.C. §3 .................................................................................24

9 U.S.C. §4 .................................................................................24

9 U.S.C. §10 ......................................................................... *passim*

9 U.S.C. §202 .............................................................................47

9 U.S.C. §207 .............................................................................48

9 U.S.C. §208 .............................................................................48

**Rules**

AAA Rule R-17 ...........................................................................11

AAA Rule R-17(a) ............................................................ 33, 45, 50

AAA Rule R-18(a) ......................................................................13

AAA Rule R-18(c) ............................................................... 13, 33

AAA Rule R-52(e) ......................................................................46

Canon II(A)(2) ...........................................................................13

Canon II(A)(4) ...........................................................................13

Canon II(D) ............................................................................ 13

**Other Authorities**

Gary B. Born, *International Commercial Arbitration* (3d ed. 2021) .....................35

Convention on the Recognition and Enforcement of Foreign Arbitral
Awards, Dec. 29, 1970, 21 U.S.T. 2517...................................... *passim*

3 Ian R. Macneil, et al., *Federal Arbitration Law* (1994) ................................ 40, 49

3 Thomas H. Oehmke, *Commercial Arbitration* (3d ed. 2020) .............................35

William Shakespeare, *Macbeth*................................................................................42

# INTRODUCTION

This appeal arises out of a massive $392 million arbitration award, plus another $130-million-plus in interest, against Appellant Occidental Exploration and Production Company ("OEPC") that Appellee Andes Petroleum Ecuador Limited ("Andes") procured in contradiction of the parties' agreement. Soon after the award issued, OEPC discovered that Andes and one of the arbitrators had been keeping a shared secret. For more than two years during the merits portion of the arbitration, arbitrator Robert Smit and Andes' lead counsel, Laurence Shore, had been collaborating as colleagues and co-arbitrators in a separate, concurrent, and confidential matter. The parties' arbitration agreement imposed detailed, extensive, and ongoing disclosure requirements with which Smit swore to comply, but he chose to stay silent on this clear conflict. Smit promptly disclosed other less significant conflicts for Andes' benefit, creating the misleading illusion of compliance with his obligations, while keeping OEPC in the dark about his close and continuous collaboration with Andes' lead counsel. Shore was equally obligated to disclose the collaboration, yet he stayed mum as well. Thus, while OEPC was working to convince Smit on the merits and on the level, unbeknownst to OEPC, Andes and its lead counsel enjoyed undisclosed, real-time, behind-the-scenes access to Smit as co-equals—access that gave Andes and Shore improper and asymmetric insights into

Smit's disposition toward particular issues, amenability to different lines of argument, and personal preferences for conducting arbitral proceedings.

Smit's disclosure violation disregarded the parties' disclosure agreements and undermined the foundation of the arbitration process. OEPC agreed to forgo its rights to the procedural protections and appellate review of the judicial process in exchange for the efficiencies of arbitration, but it did so on the express condition that the matter would be decided by "wholly independent and impartial" arbitrators who, along with the parties themselves, would abide by bargained-for disclosure requirements designed to ensure their independence and neutrality. Smit's and Shore's joint failure to disclose their collaboration as co-equals in a separate, confidential arbitration did more than just violate the agreement's unambiguous disclosure requirements; it nullified the entire framework for ensuring the wholly independent and impartial panel that both sides had agreed would decide their disputes. Had any one of Smit, Shore, or Andes fulfilled the disclosure obligations under the agreement, OEPC would have objected, Smit would have been disqualified, and OEPC would have received the independent adjudication for which the parties had bargained. Instead, Andes enjoyed the benefits of both the arbitrator it chose and another arbitrator with whom its lead counsel had an ongoing, concealed, and advantageous relationship as co-equals, while OEPC had no comparable access to Smit and was left arbitrating before a skewed panel to which

it did not consent.  The resulting massive arbitration award, issued by a compromised panel in favor of Andes, a party that manifestly violated its own disclosure obligations, cannot stand.

By confirming the award in a cursory opinion that did not even address many of OEPC's arguments, the district court disregarded the parties' agreement and failed to abide by both the Federal Arbitration Act ("FAA") and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). Under the FAA, failure to disclose a material relationship with a party meets the "evident partiality" standard, for "[a] reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side." *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007).  And under the Convention, an arbitral award cannot be confirmed when "the composition of the arbitral authority [is not] in accordance with the agreement of the parties," which plainly happens when an arbitrator fails to comply with the disclosure provisions of the arbitration agreement from which he derives his authority. *Tatneft v. Ukraine*, 21 F.4th 829, 838 (D.C. Cir. 2021).  Under both the FAA and the Convention, the judgment below should be reversed.

The district court's contrary conclusion not only is profoundly wrong, but has far-reaching effects that undermine the value of arbitration and the basic policy judgments underlying both the FAA and the Convention.  Arbitration's viability as

an alternative to litigation rests on its procedural integrity and the flexibility it gives parties to tailor agreements to their needs. The Supreme Court has emphasized repeatedly that arbitration agreements must be rigorously enforced according to their terms, including terms that "specify *with whom* the parties choose to arbitrate their disputes and *the rules* under which that arbitration will be conducted." *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1621 (2018). Here, the parties bargained for arbitrators who would be "at all times wholly independent and impartial," JA189 ¶3(c); JA294 ¶18.2.3.3, and adopted rules and continuing disclosure requirements to ensure that remained true. The decision below renders both the basic guarantee of neutrality and the agreed-upon disclosure requirements designed to ensure it mere parchment barriers.

If courts abrogate terms in the parties' arbitration agreement designed to ensure the bedrock guarantee of neutrality or, as here, abdicate their duty to "rigorously enforce" terms requiring complete independence and, instead, enforce arbitration awards reached in derogation of the parties' agreed-upon procedures, then arbitration loses its value. That is especially true in the context of international transactions, where (as here) parties resort to arbitration, and bargain for strict disclosure and neutrality provisions, because they fear local courts may be rife with undisclosed relationships and intertwined interests. *See, e.g.*, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 629-30 (1985) (recognizing

the special need for arbitration in international business transactions). In those situations, the promise of arbitration by a truly neutral and "wholly independent" panel may drive the entire arbitration agreement and, in fact, provide a necessary cornerstone for the entire transaction. To affirm the decision below would send the untenable message that negotiated neutrality and contractual disclosure agreements can be disregarded without consequence, thereby depriving arbitration agreements of much of their value in the international context where they are needed most. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court (Hellerstein, J.) issued an order and opinion granting Petitioner-Appellee's motion to confirm and denying Respondent-Appellant's motion to vacate on November 15, 2021. The district court entered a final judgment on December 2, 2021. Appellant filed a notice of appeal on December 14, 2021. The district court had jurisdiction under 9 U.S.C. §203 and 28 U.S.C. §1332(a)(4). This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the arbitration award entered against OEPC should be vacated under the FAA because an arbitrator exhibited evident partiality by concealing an ongoing relationship with Andes' lead counsel in violation of the agreement's detailed and expansive disclosure provisions. 9 U.S.C. §10(a)(2).

2.     Whether the Convention precludes confirmation of the arbitration award entered against OEPC because the concealed relationship between Andes and an arbitrator violates unambiguous terms in the parties' arbitration agreement regarding panel composition.  Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. V, §1(d), Dec. 29, 1970, 21 U.S.T. 2517, 2520.

3.     Whether the arbitration award should be vacated under the FAA because an arbitrator exceeded his powers by issuing an award despite violating unambiguous terms in the arbitration agreement from which he derived any purported authority.  9 U.S.C. §10(a)(4).

4.     Whether, at a minimum, the district court's judgment should be vacated and the case remanded for an evidentiary hearing or discovery.

5.     Whether the district court miscalculated the amount of pre-judgment interest, assuming Andes is entitled to any award.

## STATEMENT OF THE CASE

## I.     Factual Background

### A.     OEPC's and Andes' Operations in Ecuador

OEPC is a hydrocarbon exploration company.  In 1999, OEPC entered into a Participation Agreement with PetroEcuador, an Ecuadorian state-owned oil company, in which OEPC agreed to carry out exploration activities in an area referred to as Block 15.  SPA1.  The next year, OEPC entered into a Farmout Agreement and Joint Operating Agreement ("JOA") with Alberta Energy

6

Corporation ("AEC"). Through those agreements, OEPC and AEC agreed to conduct joint operations with respect to Block 15, with AEC obtaining a 40% economic interest and OEPC retaining the other 60%, subject to the approval of the Ecuadorian government. SPA1. OEPC would retain 100% of the legal title to Block 15 until that approval was obtained, but the parties nevertheless agreed to begin conducting joint operations pursuant to the 60%-40% split. JA29 ¶¶13-14. Both agreements require that all disputes be resolved through arbitration and set forth the rules and procedures for any such arbitration. JA25-28 ¶¶7-8.

The Ecuadorian government never approved the transfer and instead began threatening to terminate the Participation Contract. SPA2. OEPC sought to engage with the Ecuadorian authorities to resolve the dispute. Award ¶18. In the meantime, AEC—which through a merger had become Encana Corporation—sold its 40% economic interest in Block 15 to Andes, which is wholly owned by Chinese state-run oil companies. JA23, JA30-31 ¶¶2, 19.

Although Ecuador's ongoing refusal to approve the transfer meant that OEPC continued to hold 100% legal interest in Block 15, OEPC and Andes continued to operate pursuant to the 60%-40% split established in the Farmout Agreement and JOA. They also entered into a Letter Agreement to address what would happen if Ecuador followed through on its threat to terminate the Participation Contract. Paragraph 2(g) of the Letter Agreement provided that if Ecuador terminated the

contract and OEPC took legal action against Ecuador to recover for its 100% legal interest, OEPC and Andes would split legal fees and any monetary award 60%-40%:

> If [OEPC] receives any monetary award from the Government of Ecuador as a result of the Government's actions to enforce caducity[1] and terminate [OEPC's] contract with respect to Block 15, [OEPC] agrees that [Andes] is entitled to a 40% share in the net amount received, after all costs and expenses….

Letter Agreement, JA153 ¶2(g).

### B.    The OEPC-Ecuador Arbitration

A few months later, Ecuador terminated the Participation Contract and seized Block 15 and its associated assets.  JA31-32 ¶21.  OEPC commenced arbitration against Ecuador before the International Centre for the Settlement of Investment Disputes ("ICSID"), seeking compensation for its losses with respect to its 100% legal interest in Block 15.  JA32 ¶22.  Consistent with the Letter Agreement, Andes did not participate as a party in the ICSID Arbitration.  JA32 ¶23.

The ICSID tribunal ultimately ruled in OEPC's favor, holding that Ecuador violated Ecuadorian and customary international law by terminating the Participation Contract.  JA33 ¶28.  The tribunal valued OEPC's 100% interest in Block 15 at $2.395 billion, but it assessed a 25% penalty against OEPC for

---

[1] The parties used the terms "caducity" or "caducidad," the Spanish word for *expiration*, to refer to Ecuador's termination of the Participation Contract.

attempting to assign the 40% interest to Andes without government approval, leading to a total award of $1.77 billion, plus interest.  JA ¶27-28.

Ecuador appealed the award to an annulment committee.  Ecuador argued that the tribunal could not award OEPC damages for the 40% economic interest that OEPC had assigned to Andes, and could instead award OEPC damages only with respect to OEPC's own 60% share, leaving Andes to pursue its own remedies.  The annulment committee agreed, ruling that the tribunal "manifestly exceeded its powers by wrongly assuming jurisdiction with regard to the investment now beneficially owned by the Chinese investor Andes."  JA34 ¶31.  Accordingly, the committee determined that "the compensation owed to [OEPC] should be reduced from 100% to 60% of the value of Block 15," leading to an award of $1.06 billion, plus interest.   JA34 ¶31.[2]   The committee made clear, however, that Andes' investment was protected and that Andes remained free to pursue relief for its 40% interest, stating that its decision did not "imply that investors holding beneficial ownership are left unprotected" and that Andes was "entitled to the protection which investors from Bermuda/China enjoy, when investing in Ecuador, under applicable

---

[2] OEPC eventually settled its 60% claim against Ecuador for $980 million and a release of various disputed tax and labor amounts.  *See* JA453-91.  The settlement expressly did not release any claims arising from Ecuador's expropriation of Andes' 40% economic interest.  JA502.

bilateral investment treaties or under general principles of international law." JA34 ¶32.

Andes refused to pursue any action against the Ecuadorian government, whose approval it needs to continue its other, extensive operations in Ecuador. Instead, acting as if the annulment proceedings never happened, Andes demanded that OEPC hand over 40% of the amount it recovered in the arbitration, even though that award expressly did not include compensation for *any* of Andes' 40% interest in Block 15. JA35 ¶34. OEPC rejected Andes' demand and offered to refund Andes' portion of the legal costs, explaining (as Andes already knew) that OEPC recovered only its own 60% share, leaving Andes free to pursue recovery of its own 40% interest from Ecuador. JA35 ¶34. Andes reasserted its demand for 40% of OEPC's 60% and commenced an arbitration proceeding against OEPC. That arbitration proceeding is the subject of this appeal.

## C. The OEPC-Andes Arbitration

### 1. Disclosure Requirements in the OEPC-Andes Arbitration Agreement

As noted, the Farmout Agreement and JOA require OEPC and Andes to resolve disputes through arbitration and detail the rules that govern any such arbitration. Foremost among the matters addressed in the arbitration provisions is the neutrality and independence of the arbitral panel. OEPC opted for arbitration in large part because of concerns about the fairness of the Ecuadorian courts, and

exchanging one unreliable tribunal for another would achieve nothing. Accordingly, the agreements set forth and incorporate numerous rules and procedures to ensure transparency and arbitral independence, including expansive and detailed disclosure requirements.

The agreements specify that a panel of three arbitrators would decide disputes under the contracts; each party would be entitled to appoint "an arbitrator of its choice," and the two party-appointed arbitrators would "in turn appoint [the third] presiding arbitrator." JA189 ¶2; JA294 ¶18.2.2. Unlike arbitrations in which the two party-appointed arbitrators are expected to act as advocates, *see* JA209, Rule R-18(b), the agreement requires all three arbitrators to be neutral. JA189 ¶2; JA294 ¶18.2.2. It further mandates that "the arbitrator(s) shall be and remain at all times wholly independent and impartial." JA189 ¶3(c); JA294 ¶18.2.3.3.

The parties specifically backstopped that "independent and impartial" requirement by incorporating the American Arbitration Association ("AAA") rules and their expansive disclosure requirements. JA189 ¶3(d); JA294 ¶18.2.3.4; *see* Dkt.35-1 at 14 ("Compared to such peer institutions … the AAA through its Commercial Rules imposes duties of disclosure that are exceedingly broad in terms of the participants bound by them."). Of particular importance here, AAA Rule R-17 requires the arbitrators, parties, and parties' counsel to "disclose … any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or

independence," including "any past or present relationship with the parties or their representatives." JA208, Rule R-17. The obligation not only applies at the time of appointment, but requires *ongoing* disclosures as circumstances warrant. In full, the provision states:

> Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose … any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

*Id.*

The parties' agreements require the arbitrators to execute an oath acknowledging their continuing disclosure obligation. The oath form states that "[i]t is most important that the parties have complete confidence in the arbitrator's impartiality," and makes explicit that the arbitrators' disclosure obligation "is a continuing obligation throughout [their] service." JA239. To that end, the oath form expressly states that "any additional direct or indirect contact [that] arise[s] during the course of the arbitration … must … be disclosed," and that "any doubts should be resolved in favor of disclosure." JA239. The form expansively describes the types of relationships that the arbitrators must disclose on an ongoing basis, including "any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other

kind." JA239. And to close any potential gaps, the form requires disclosure "of any other information that may lead to a justifiable doubt as to your impartiality or independence or create an appearance of partiality." JA239.

Finally, the oath form incorporates the AAA's Code of Ethics for Commercial Arbitrators, which requires arbitrators to disclose any relationship that "might reasonably affect impartiality or lack of independence in the eyes of any of the parties"—including those "with any party or its lawyer." Canon II(A)(2). The Ethics Code also requires arbitrators to disclose "any other matters, relationships, or interests which they are obligated to disclose by the agreement of the parties." Canon II(A)(4). When complying with either of these requirements, "[a]ny doubt as to whether or not disclosure is to be made should be resolved in favor of disclosure." Canon II(D).

These detailed and comprehensive disclosure requirements were designed to ensure that neither party would appoint arbitrators whose independence or impartiality was or even might appear to be compromised, and they provided recourse if an arbitrator's independence or impartiality became compromised during the proceedings. If a relationship arose with a party or its counsel and was disclosed, either party had the right to object to the arbitrator's continued service, and the AAA would adjudicate any objections. JA209, Rule R-18(c). Any arbitrator whom the AAA determined to be partial or otherwise in breach of his contractual duties would

"be subject to disqualification," JA209, Rule R-18(a), and in such a case, the parties' agreement provides that "a successor arbitrator shall be selected and appointed in the same manner as the original arbitrator." JA190 ¶3(*l*); JA295 ¶18.2.3.12. Thus, if a party-appointed arbitrator was removed for any reason, his replacement would be chosen by the party that appointed him.

## 2. The Arbitration Process and Decision

OEPC and Andes each appointed one arbitrator to the tribunal that would arbitrate their dispute over the award OEPC secured through the ICSID arbitration. OEPC interviewed and conducted thorough diligence on several candidates, including Robert Smit. JA183 ¶18. During the interview process, Smit disclosed that a company represented by Andes' law firm of record and, at the time, the firm of Andes' lead counsel Laurence Shore, had recently appointed Smit to serve as an arbitrator in an unrelated matter. OEPC followed up and asked Smit whether he had any relationship with Shore other than that one arbitration; Smit responded that "the new case I told you about is the only one I've ever done involving [Shore]. (I basically know him from arbitration conferences)." JA519.

OEPC decided to appoint Smit to the panel, while Andes appointed Richard Ziegler. Smit and Ziegler then selected James Hosking to serve as the presiding arbitrator. As part of the appointment process, Smit executed the Arbitrator's Oath, thereby acknowledging his "continuing obligation" to "disclose any past or present

relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind." JA239. The oath form required Smit to list any relationship requiring disclosure. Smit disclosed the aforementioned arbitration in which he was appointed by Shore's firm's client. JA240. He also disclosed that, ten years earlier, "[t]he other party-arbitrator, Richard Ziegler, and I represented opposing parties as counsel in an international arbitration." JA240. Consistent with his continuing obligation, Smit reiterated that he would disclose "any additional direct or indirect contact" with the parties or counsel that may "arise during the course of the arbitration." JA239. Smit made similar commitments in his compensation agreement. JA540.

Throughout the arbitration proceedings, Smit and the other arbitrators continually—but not completely, in Smit's case—updated their disclosures as new facts arose. For example, when OEPC retained Debevoise & Plimpton as additional counsel in May 2018, Smit disclosed that he was "a member [of] a Tribunal in an unrelated ICC arbitration in which Debevoise appear as counsel for one of the parties," and that "[David] Rivkin of Debevoise appears … both in this arbitration as well as in the ICC arbitration." JA560. Ziegler made four supplemental disclosures, including that he was retiring from law practice and establishing an independent dispute-resolution practice. JA184-85 ¶21; see JA521-74. Hosking made two supplemental disclosures, including that a mentee assigned to him by an

arbitration group had accepted an internship with one of the firms representing OEPC. JA184-85 ¶21; *see* JA521-74. Smit made no additional disclosures. Andes and its lead counsel, Laurence Shore, made none.

The OEPC-Andes arbitration proceeded for more than three years, during which the parties disputed a variety of procedural and substantive issues. *See* JA36-54 ¶¶41-129. On March 26, 2021, the panel ruled in favor of Andes. The panel did not deny that the earlier tribunal had compensated OEPC for only its 60% interest in Block 15, or that Andes remained free to pursue its 40% interest from Ecuador. Nevertheless, the panel concluded that Andes was entitled to 40% of OEPC's 60% share—a windfall of $392 million, plus another $130-million-plus in pre-judgment interest. Among other things, the panel ruled that the Letter Agreement required OEPC to pay Andes 40% of its recovery even though that recovery did not include compensation for Andes' economic interest; that OEPC's ability to recover damages for 100% of economic interests in Block 15 was not a condition precedent of that obligation; that the annulment committee's ruling did not frustrate the fundamental purpose of the Letter Agreement; and that Andes was not required to mitigate its losses by pursuing recovery against Ecuador.

### 3.    Smit, Shore, and Andes' Concealment of a Material Relationship

Shortly after the panel issued its highly suspect award, OEPC discovered some startling information:  Throughout the arbitration proceedings, Smit had been

concealing an ongoing relationship with Andes' lead counsel, Shore, and Shore and Andes had concealed it too. Beginning in April 2018 (mere months after the panel was constituted) and lasting all the way until August 2020, Smit and Shore served together as co-arbitrators on a separate, undisclosed matter (the "ICC Arbitration"). *See* JA508-09. In fact, Shore was the president of that tribunal. JA581. The ICC Arbitration was conducted confidentially, so most of its details remain unknown to OEPC, but like the arbitration here, it involved a contract dispute in the energy sector. JA580 ¶¶22-23 & n.1. Thus, for nearly the entirety of the merits proceedings in this matter, Smit and Shore secretly maintained a close, direct relationship as co-equals in a confidential arbitration that gave Shore a behind-the-scenes look at Smit's decision-making process, inside information on his views about specific contract doctrines, and ample opportunity for *ex parte* communication, collegial discussions, and collaborative decision-making. Incredibly, Smit and Shore never disclosed this relationship to OEPC.

Upon discovering the relationship, OEPC notified Andes by letter that it intended to seek vacatur of the arbitration award. The letter explained that "[a]fter the Andes Award was issued, OEPC learned that Andes' counsel, Mr. Laurence Shore, and one of the appointed arbitrators, Mr. Robert Smit, had a significant and ongoing joint engagement as co-arbitrators in another matter pending concurrently with the Andes-[OEPC] arbitration." JA508. The letter noted that "Mr. Smit and

Mr. Shore each concealed this relationship" in violation of the "contractual mandate that arbitrators 'shall be and remain at all times wholly independent and impartial'" and "in breach of the … express disclosure rules that obligated both Andes and Mr. Smit to disclose the existence of this relationship."  JA508.  Andes denied any wrongdoing but did not deny the existence of the relationship. Instead, Andes merely asserted that "[w]e can confirm that this ICC tribunal is the only one on which Mr. Shore and Mr. Smit have both served as arbitrators."  JA511.

## II.    Procedural Background

Andes initiated this action with a petition to confirm the arbitration award in the Southern District of New York.  JA9-18.  OEPC moved to vacate the award and opposed Andes' petition.  Dkt.28, Dkt.35.  OEPC argued, among other things, that the award should be vacated under the FAA on grounds of evident partiality, 9 U.S.C. §10(a)(2), that the award should be vacated because an arbitrator exceeded his powers, 9 U.S.C. §10(a)(4), and could not be confirmed under the Convention because the arbitration panel was not constituted in accordance with the parties' arbitration agreement, Convention art. V, §§1(d), 2(b).  After briefing on those motions was complete, the case was eventually reassigned from Judge Cote (who herself was the third judge assigned to the case) to Judge Hellerstein.

Two weeks after being assigned the matter, and without hearing argument or ruling on OEPC's request for argument, Judge Hellerstein confirmed the nearly half-

billion-dollar award and denied OEPC's motion to vacate in a conclusory nine-page opinion. Judge Hellerstein rejected OEPC's arguments regarding evident partiality with one sentence of analysis and in sole reliance on a case addressing an undisclosed arbitrator-arbitrator relationship, rather than the far more serious issue of an undisclosed arbitrator-party relationship. SPA6 (citing *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60 (2d Cir. 2012)). Judge Hellerstein did not even address OEPC's arguments under the Convention.

Andes submitted a proposed final judgment, which included $166,107,500.79 in pre-judgment interest, and attached a spreadsheet that purported to explain how it arrived at that number. JA776. The Court gave OEPC a mere 48 hours to respond. OEPC filed a detailed submission explaining that Andes' calculation was legally and mathematically flawed, and that the proper amount of pre-judgment interest was about $34 million less: $132,089,357.15. JA785. Hours later, without opinion or explanation, Judge Hellerstein signed Andes' proposed judgment, awarding it a total of $558,577,380.56, plus costs and post-judgment interest. SPA11-12. This appeal followed.

## SUMMARY OF ARGUMENT

OEPC and Andes agreed to submit their disputes to a panel of three arbitrators who were "at all times wholly independent and impartial." To enforce that impartiality requirement, the arbitration agreement incorporated a rigorous regime

of disclosure and disqualification: Arbitrators, parties, and counsel had a continuing obligation to make detailed disclosures, including of "any past or present relationship" they had with counsel. If a disclosure gave cause for concern, either party had the right to object to an arbitrator's continued service before a separate arbitration panel. And if that panel removed the arbitrator, the replacement would be "appointed in the same manner as the original arbitrator." For almost the entire course of the arbitration, Smit and Andes flouted this regime by concealing that Smit was sitting alongside Andes' lead counsel as a co-equal co-arbitrator in a separate, concurrent, and confidential matter. That cover-up breached unambiguous disclosure requirements and vitiated the framework for impartiality at the core of the agreement. By nevertheless confirming the award, the district court not only dishonored the parties' agreement, but failed to follow the FAA and the Convention, both of which require assiduous adherence to the terms of the agreement, not cavalier dismissal of blatant violations of agreed-to disclosure and impartiality provisions.

**I.** Smit's undisclosed relationship with Andes' lead counsel requires vacatur for evident partiality under the FAA. *See* 9 U.S.C. §10(a)(2). Evident partiality exists whenever a reasonable person, informed of the terms of the parties' agreement and all relevant circumstances, would have to conclude that an arbitrator was partial to one party. Applying that standard, this Court has explained that a reasonable observer would find evident partiality when an arbitrator maintains a material

relationship with a party and fails to disclose that relationship. Here, Smit inexcusably concealed an ongoing, material relationship that provided Andes' lead counsel with status as a co-equal and real-time, behind-the-scenes access to his views about specific contract-law issues, amenability to particular strategies, and procedural preferences for conducting arbitration. Indeed, the panel on which Smit and Shore collaborated rendered its confidential award just two-and-a-half weeks before the merits hearing in this arbitration, allowing Shore to apply fresh insights from his close collaboration with Smit. Smit, Andes, and Shore all stayed inexplicably silent about this pivotal relationship while Smit quickly disclosed relatively innocuous matters, creating a false impression of compliance and preventing OEPC from invoking its bargained-for right to object to Smit's continued service. Given these circumstances, a reasonable person would have to conclude that evident partiality existed.

**II.** By nullifying the arbitration agreement's framework for ensuring impartiality, Smit's, Andes' and Shore's shared nondisclosure also produced a panel composition that deviated from the parties' agreement, which independently precludes confirmation under the Convention. *See* Convention art. V, §1(d). Decisionmaker impartiality is particularly critical to international arbitration, a context in which parties often turn to arbitration and bargain for strict disclosure and independence requirements precisely because of a perception that such safeguards

are absent in foreign courts. To ensure strict adherence to such provisions, the Convention precludes confirmation of an arbitral award if the composition of the arbitral authority was not in accordance with the parties' agreement.

Where, as here, the parties agree that their panel will be composed of wholly independent and neutral arbitrators who will comply with extensive, bargained-for disclosure requirements, and where, as here, one of the arbitrators compromises his neutrality, conceals his lack of independence, and disregards the disclosure requirements, the Convention precludes confirmation. Not only did Smit, Shore, and Andes violate clear disclosure obligations; their joint concealment prevented OEPC from seeking Smit's removal pursuant to the agreement, which guaranteed that a separate arbitral body would address disqualification. In turn, the joint concealment foreclosed OEPC from exercising its contractual right to appoint Smit's successor unilaterally. The Convention's robust protection of panel-composition provisions entitles OEPC to a new arbitration under the terms of the arbitration agreement. For the same reasons, the award must be vacated under 9 U.S.C. §10(a)(4).

**III.** Alternatively, the district court's judgment should be vacated and the case remanded for an evidentiary hearing or discovery. Andes and Smit disregarded core provisions of the arbitration agreement in violation of their repeated promises to disclose. Their joint concealment preserved both Smit's continued service in a

lucrative position that provided an ongoing opportunity for *ex parte* communications and Andes' material advantage in a high-stakes arbitration. These undisputed facts at least warrant discovery into the scope and nature of Smit's and Shore's collaboration and *ex parte* communications, as well as the amount of legal overlap between the two arbitrations, which both involved questions of contract interpretation. Even a skeptical reasonable observer would at least want to know the extent to which Shore was privy to inside information about Smit's views on the same doctrines Smit later applied in awarding Shore's client a half-billion-dollar windfall.

**IV.** If this Court does not reverse on the merits, it should at the very least vacate the district court's reflexive and unexplained decision to award Andes $34 million more in pre-judgment interest than is due under the terms of the parties' agreement and principles of basic mathematics. Andes' calculations, on which the court presumably relied in signing Andes' proposed order without explanation, contain two obvious errors—one legal, one mathematical—that combine to overstate the amount of pre-judgment interest by over $34 million. Thus, at a bare minimum, this Court should vacate and either render judgment for the proper amount or remand for re-calculation of interest.

## STANDARD OF REVIEW

When a district court confirms an arbitration award under the FAA, this Court reviews its conclusions of law *de novo* and its findings of fact for clear error. *See Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002). Because the district court made no factual findings, this Court reviews the decision below *de novo*. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 & n.6 (2d Cir. 2017).

## ARGUMENT

### I. The Arbitration Award Should Be Vacated For Evident Partiality.

#### A. The FAA and its Evident-Partiality Standard

The FAA's "first" and "foundational" principle is that "arbitration is strictly a matter of consent." *Lamps Plus, Inc. v. Varela*, 139 S.Ct. 1407, 1415 (2019). The FAA requires courts to "rigorously … enforce arbitration agreements according to their terms, including terms that specify with whom the parties choose to arbitrate their disputes and the rules under which that arbitration will be conducted." *Epic Sys.*, 138 S.Ct. at 1621 (emphasis omitted). The FAA's focus on the terms of the parties' agreement is evident throughout its provisions. Section 3 requires courts to stay litigation of arbitrable claims "in accordance with the terms of the [arbitration] agreement." 9 U.S.C. §3. Section 4 emphasizes the court's duty to compel arbitration "in accordance with the terms of the [arbitration] agreement." 9 U.S.C. §4. And Section 10 empowers courts to vacate awards arising from arbitral proceedings that deviated from the terms of the parties' agreement. 9 U.S.C. §10.

Together, these provisions embody an overarching federal policy "to give effect to the intent of the parties" as reflected in their arbitration agreement. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682, 684 (2010).

Congress recognized that parties do not and would not consent to submit their disputes to arbitration—where arbitrators "have completely free rein to decide the law as well as the facts and are not subject to appellate review"—without a baseline guarantee of fairness. *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968) (plurality op.). Congress thus empowered courts to vacate arbitration awards in the event of an arbitrator's "evident partiality." 9 U.S.C. §10(a)(2); *see Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008). The evident-partiality provision reflects Congress' intention "to provide not merely for any arbitration but for an impartial one." *Commonwealth Coatings*, 393 U.S. at 147 (plurality op.). By vacating awards that deviate from the parties' expectations of neutrality, federal courts "maintain the integrity of [their] role in affirming or vacating awards." *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984).

A finding of evident partiality does not require "proof of actual bias," *id.*, or a showing of subjective bad faith, *Applied Indus.*, 492 F.3d at 138-39. This Court instead applies a "reasonable person" test, vacating awards whenever a reasonable person, in view of all relevant circumstances, "would have to conclude that an

arbitrator was partial to one party to the arbitration." *Morelite*, 748 F.2d at 84. One circumstance in which a reasonable person would have to do so is when the arbitrator "knows of a material relationship with a party and fails to disclose it." *Applied Indus.*, 492 F.3d at 137. The FAA requires arbitrators to "take steps to ensure that the parties are not misled into believing that no nontrivial conflict exists." *Id.* at 138. That requires leaving determinations about the materiality of a potential conflict to the parties by "err[ing] on the side of disclosure." *Commonwealth Coatings*, 393 U.S. at 152 (White, J., concurring). Applying this rule, the Supreme Court and this Court have vacated arbitration awards for evident partiality when an arbitrator failed to disclose a financial relationship with one of the parties, *id.* at 150, failed to disclose a familial relationship with one of the parties, *Morelite*, 748 F.2d at 85, or failed to disclose a business relationship with one of the parties, *Applied Indus.*, 492 F.3d at 139.

While the FAA itself imposes a "requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias," *Commonwealth Coatings*, 393 U.S. at 149, parties may ratchet up or down that baseline disclosure requirement. "[P]arties are free to choose for themselves to what lengths they will go in quest of impartiality." *Certain Underwriting Members of Lloyds of London v. Fla., Dep't of Fin. Servs.*, 892 F.3d 501, 508 (2d Cir. 2018); *see also Hall St.*, 552 U.S. at 586 ("[T]he FAA lets parties tailor … the way arbitrators

are chosen, [and] what their qualifications should be."). Some parties might view entanglements between the arbitrators and the parties as a necessary evil, especially in contexts where the "most capable potential arbitrators are repeat players with deep industry connections." *Lloyds*, 892 F.3d at 507. Other parties might view the same sorts of relationships as unacceptable, demanding absolute neutrality even at the cost of expertise, experience, or expense. And still other parties might seek to resolve such matters on a case-by-case basis, requiring arbitrators to disclose all potential conflicts so that they can assess for themselves on an ongoing basis whether potential entanglements are acceptable.

Rather than create a one-size-fits-all rule, the evident-partiality standard incorporates the parties' agreement on such matters. A "reasonable person, considering all of the circumstances," *Applied Indus.*, 492 F.3d at 137, would consider the terms of the parties' agreement as the most material of circumstances, and would draw very different conclusions from an arbitrator's non-disclosure of a potential conflict under an agreement that accepts certain entanglements than under one that demands absolute transparency and independence. Accordingly, this Court's decisions have always assessed evident partiality in light of the parties' agreement, and indeed have repeatedly recognized that "an undisclosed relationship is material if it violates the arbitration agreement." *Lloyds*, 892 F.3d at 508 (citing *Sphere Drake Ins. v. All Am. Life Ins.*, 307 F.3d 617, 622 (7th Cir. 2002)).

In *Applied Industries*, for example, the agreement imposed upon the arbitrator an ongoing obligation to ensure that neither he nor his employer had "a direct or indirect interest in the outcome of the arbitration." 492 F.3d at 139. When the arbitrator learned that his employer was negotiating a business deal with one of the parties, he failed to investigate the full extent of that relationship. *Id.* This Court vacated the resulting award for evident partiality. The panel emphasized that it was not creating a "free-standing duty to investigate," but held that such a duty existed because of the arbitrator's specific contractual "duty to ensure that neither he nor his corporation had a direct or indirect interest in the outcome of the arbitration." *Id.* at 138-39. In light of the arbitrator's failure to comply with that contractual obligation, "a reasonable person would have to conclude that evident partiality existed." *Id.* at 139; *see also Pitta v. Hotel Ass'n of N.Y.C., Inc.*, 806 F.2d 419, 424 (2d Cir. 1986) (disqualifying arbitrator for evident partiality because conflict of interest made him "'incapable of acting' within the meaning of paragraph 15 of the Agreement").

This Court applied the same principles to the converse situation in *National Football League Management Council v. National Football League Players Association* (*Brady*), 820 F.3d 527 (2d Cir. 2016). There, the Court refused to vacate an award for evident partiality despite the arbitrator's obvious conflict of interest— namely, he was charged with "adjudicat[ing] the propriety of his own conduct"— because the parties' agreement expressly permitted that conflict. *Id.* at 548. The

parties contracted "to specifically allow the Commissioner to sit as the arbitrator … knowing that the Commissioner would have a stake … in every arbitration." *Id.* Accordingly, the Commissioner's conflict did not warrant vacatur for evident partiality, *id.*, even though it surely would have absent such a contractual provision, *cf. Pitta*, 806 F.2d at 424. As this Court explained, "arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen." *Brady*, 820 F.3d at 548.

This Court reaffirmed the centrality of the parties' agreement to the evident-partiality analysis in *Lloyds*. There, instead of contracting for three neutral arbitrators, the parties agreed that two party-appointed arbitrators would "serve as *de facto* advocates" working to convince a third, neutral arbitrator to rule in favor of the party who appointed them. 892 F.3d at 508, 510. The district court found evident partiality because one of the party-appointed arbitrators failed to "disclose close relationships with" the party that appointed him, but this Court reversed. 892 F.3d at 503. While this Court reiterated that "an undisclosed relationship is material if it violates the arbitration agreement," it explained that the evident-partiality standard is more difficult to satisfy when the parties' agreement explicitly provides that the arbitrator will be non-neutral. *Id.* at 508, 510. When the parties agree to use non-neutral arbitrators, expecting those arbitrators to exhibit "the same level of institutional impartiality applicable to neutrals would impair the process of self-

governing dispute resolution." *Id.* at 510. Though the arbitrator's failure to disclose the full extent of his relationships with the party that appointed him would have demonstrated evident partiality if the parties' contract required him to be neutral, *id.* at 509, the non-disclosure there did not run afoul of the parties' agreement, which authorized the use of non-neutral arbitrators, *id.* at 511. The evident-partiality standard is thus inextricably linked to the FAA's overarching command to "rigorously enforce arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013).

To be sure, not every failure to disclose evinces evident partiality. The ultimate touchstone is "*partial*[*ity*] *to one side*," *Applied Indus.*, 492 F.3d at 137 (emphasis added), so the failure to disclose a relationship that is *not* suggestive of a predisposition "to favor one party over another" cannot support vacatur. *See Scandinavian Reinsurance*, 668 F.3d at 74. Thus, an undisclosed relationship between two neutral arbitrators is less likely to warrant vacatur for evident partiality because, unlike an arbitrator-party relationship or an arbitrator-counsel relationship, an arbitrator-arbitrator relationship does not suggest "the possibility of bias for or against a particular arbitrating party." *Id.* Similarly, failure to disclose a relationship that does not blur the lines between neutrals and non-neutrals, such as an additional appearance as a non-neutral advocate before an arbitrator in a separate arbitration, may be less troubling. *See, e.g.*, *Dow Corning Corp. v. Safety Nat'l Cas. Corp.*, 335

F.3d 742, 750 (8th Cir. 2003); *cf. In re Kensington Int'l Ltd.*, 368 F.3d 289, 303-05 (3d Cir. 2004) (finding structural conflict of interest where neutral advisors to judge simultaneously served as advocates in similar cases). Vacatur is also unwarranted if the undisclosed relationship is "trivial," *Commonwealth Coatings*, 393 U.S. at 150 (White, J., concurring), or "insubstantial," *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 31 (2d Cir. 2004) (two arbitrators did not disclose their "co-ownership of an airplane more than a decade ago"). But when an arbitrator from whom the parties demand transparency and neutrality fails to disclose a non-trivial relationship that reflects a lack of neutrality and inures to the benefit of one party, "a reasonable person would have to conclude that evident partiality existed." *Applied Indus.*, 492 F.3d at 139.

### B. Arbitrator Robert Smit Exhibited Evident Partiality.

Here, a reasonable observer would see the following: The parties' arbitration agreement placed a high premium on independence and impartiality, demanding arbitral neutrality and imposing a continuing obligation to disclose "any past or present relationship" between an arbitrator and any party or counsel. Smit swore multiple times, in unequivocal terms, to abide by that requirement. Andes and Shore bound themselves to that obligation too. Nevertheless, Smit concealed an ongoing, material, and lucrative relationship with Andes' lead counsel for more than two years—a relationship that deprived OEPC of the promised "wholly independent and

impartial" arbitrator, and that Smit knew gave Shore an opportunity for *ex parte* communications and an inside look at Smit's thought processes in real time with the underlying arbitration. All the while, Smit disclosed other potential conflicts, including relatively trivial ones, negating any possibility of inadvertence and creating the illusion of compliance. "[G]iven these circumstances, a reasonable person would have to conclude that evident partiality existed." *Applied Indus.*, 492 F.3d at 139.

1. This is not a case in which the parties bargained for non-neutral arbitrators or ratcheted down the FAA's baseline disclosure requirements. To the contrary, they ratcheted them up. The parties' agreement reflects a deep concern for arbitral neutrality, imposing a heightened standard of independence and impartiality alongside an aggressive disclosure regime that channels any remotely colorable risk of partiality to a separate arbitration panel. That paramount concern for neutrality is a product of the context in which the agreement arose. Absent arbitration, OEPC risked litigating any disputes that may arise out of the parties' relationship in the courts of a government that expropriated its property, and against a party that was, and remains, in an ongoing relationship with that government. *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974) (explaining that international arbitration agreements "obviat[e] the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties"). OEPC

understandably contracted for an alternative through arbitration and understandably insisted that arbitration would not replicate the defects of other available fora, but would be a truly independent and impartial alternative.

OEPC thus consented only to arbitrators who were "at all times wholly independent and impartial." JA189 ¶3(c); JA294 ¶18.2.3.3. The arbitration agreement enforced that heightened impartiality requirement by incorporating the AAA's especially detailed regime for arbitrator disclosure and disqualification. JA189 ¶3(d); JA294 ¶18.2.3.4; *see* Dkt.35-1 at 14 ("Compared to such peer institutions … the AAA through its Commercial Rules imposes duties of disclosure that are exceedingly broad in terms of the participants bound by them."). The agreement thus imposed a continuing obligation on arbitrators, parties, and counsel to "disclose … any past or present relationship with the parties or their representatives." JA208, Rule R-17(a). It likewise stripped the arbitrators of any jurisdiction to adjudicate disputes over their own removal and instead committed that authority to the AAA. JA209, Rule R-18(c). To underscore these rules, the agreement clarified that the arbitrators "shall not have jurisdiction or authority to add to, detract from or alter in any way [its] provisions." JA190 ¶3(m); JA295 ¶18.2.3.13. These were the "rules" the district court was required to "rigorously enforce." *Epic Sys.*, 138 S.Ct. at 1621.

Smit knew the arbitration agreement imposed rigorous and continuing disclosure obligations on him. He repeatedly promised that he would adhere to them. In the various forms he signed as a condition of his service, he agreed that he would disclose any "direct or indirect contact" with the parties or counsel "during the course of the arbitration," JA239, acknowledged that he had a "continuing obligation" to "disclose any … relationship with the parties [or] their counsel," JA239, agreed that he would resolve "[a]ny doubts … in favor of disclosure," JA239, and promised to "disclose any direct or indirect relationship" with the parties, JA540. Likewise, he acknowledged the paramount importance of the parties' "complete confidence in [his] impartiality," JA239, and that a failure to disclose would be a "serious transgression and may be grounds for … removal as arbitrator … and/or from the AAA's Roster," JA540. On top of that, he necessarily agreed to abide by the terms of the arbitration agreement when he accepted the position. *See, e.g.*, *Sokolowski v. Metro. Transp. Auth.*, 723 F.3d 187, 191 (2d Cir. 2013).

Notwithstanding these unambiguous promises, for more than two years during the merits stage of the arbitration, Smit maintained and concealed an ongoing relationship with Shore, Andes' lead counsel, in the confidential ICC Arbitration, in which the two had ample opportunities to exchange *ex parte* communications and collaborate as co-equals. That undeniable breach of Smit's disclosure obligations deprived OEPC of the twin promises of independence and impartiality at the core of

its agreement to submit this dispute to arbitration. OEPC did not bargain for, or agree to, a process in which arbitrators could maintain ongoing secret collaborations where representatives of their adversaries were treated as trusted co-equals. Nor did OEPC bargain for, or agree to, a regime where arbitrators could decide for themselves whether relationships with the parties or their counsel might compromise their neutrality. Instead, OEPC bargained for an agreement under which arbitrators must remain neutral and err at all times on the side of disclosure, and one under which the parties would have recourse should potentially troubling relationships arise during the arbitration.

Smit's actions violated that bargain multiple times over. Not only did he fail to disclose a relationship that he was obligated to disclose; he failed to disclose a relationship that self-evidently deprived OEPC of the "at all times wholly independent and impartial" panel to which it was entitled. That alone suffices to demonstrate evident partiality, for "an undisclosed relationship is material if it violates the arbitration agreement." *Lloyds*, 892 F.3d at 510. Moreover, had Smit disclosed his ongoing relationship with Andes' lead counsel, OEPC would have objected to Smit's continued service and received the benefit of a separate adjudication from an independent body about his ability to continue serving. *See* JA180 ¶7. Under AAA procedures, Smit would not have even known about, much less been permitted to resolve, that objection. *See* 3 Thomas H. Oehmke,

*Commercial Arbitration* §69:11 (3d ed. 2020); Gary B. Born, *International Commercial Arbitration* §12.06, at 2056-57 (3d ed. 2021). And had the AAA agreed with OEPC's assessment of the relationship, which seems inevitable given both the ongoing collaboration between a neutral and a non-neutral and the failure to disclose it, the agreement would have empowered OEPC to name Smit's successor unilaterally. JA190 ¶3(*l*); JA295 ¶18.2.3.12; Giorgetti Report, Dkt.35-2 ¶¶29-35. By keeping the ongoing relationship secret, Smit not only kept from OEPC critical information he was obligated to share, but arrogated to himself the power to adjudicate his own disqualification. Smit's actions violated the arbitration agreement and ensured his own continued, lucrative service. In the process, Smit destroyed OEPC's contractual right to disclosure and prejudiced its correlative rights to object to his continued service and have the matter assessed by an independent tribunal.

"[A]rbitration is strictly a matter of consent," *Lamps Plus*, 139 S.Ct. at 1415, and OEPC did not consent to non-neutrality or subversion. OEPC was the only party that did not know about the ongoing relationship between its supposedly neutral decisionmaker and its decidedly non-neutral opposing counsel. Its consent to arbitrate before the panel was thus vitiated by Andes' and Smit's simultaneous failure to disclose a critical, contemporaneous, and advantageous relationship. And because the relationship remained concealed until after the arbitration concluded, the breach rendered worthless each of the independence and impartiality provisions

that underpinned OEPC's consent. In place of these bargained-for safeguards, OEPC received a sub-rosa, unilateral, and deeply flawed determination of impartiality by a self-interested decisionmaker who, unsurprisingly, effectively ruled in favor of his own continued service.

More troubling still, Smit remained silent despite knowing that OEPC was especially concerned about entanglements with Shore. Before appointing Smit, OEPC's counsel emailed Smit specifically about his relationship with Shore (and only about Shore), asking Smit to confirm that other than one previously disclosed case, he had never "been appointed by or worked on a case with [Shore]." JA519. Smit responded that "the new case I told you about is the only one I've ever done involving [Shore]. (I basically know him from arbitration conferences)." JA519. While that may have been true at the time, OEPC's specific focus on the Smit-Shore relationship put Smit on notice that OEPC considered any entanglements with Shore especially important. Smit's failure to comply with his "ongoing obligation to disclose conflicts" after he "previously assured the parties that he intended to comply with that obligation," knowing full-well of OEPC's particular interest in relationships with Shore, plainly violated the parties' agreement and would lead "a reasonable person … to conclude that evident partiality existed." *Applied Indus.*, 492 F.3d at 138-39; *see also Lloyds*, 892 F.3d at 510 ("an undisclosed relationship is

material if it violates the arbitration agreement"); *accord Sphere Drake*, 307 F.3d at 622.

2. That conclusion is powerfully reinforced by the nature of the relationship Smit concealed. This was not some chance meeting at an arbitration conference or other trivial encounter with little prospect of compromising neutrality or benefiting one party. The ongoing Smit-Shore relationship destroyed Smit's independence and neutrality, blurred the lines between neutrals and adversaries, and had the capacity to give Andes a substantial advantage in the arbitration proceedings. First, that ongoing relationship compromised Smit's status as a neutral because he had an ongoing collegial relationship as a trusted co-equal with a party who represented OEPC's non-neutral adversary in this proceeding. *See, e.g., Univ. Commons-Urbana, ltd. v. Universal Constructors, Inc.*, 304 F.3d at 1331 (11th Cir. 2002) ("[S]erving as the decision-maker in one action in which a colleague in another action represents a party clearly poses the possibility of bias."); Coe Decl., Dkt.35-1 ¶¶24-27. Smit's ability to process Shore's presentations neutrally was compromised by his simultaneous service with Shore as a trusted colleague in a capacity where they jointly shared confidential information, *ex parte* communications, and decisional responsibilities. That relationship blurred the lines between neutrals sworn to independence and impartiality and non-neutrals with fiduciary duties to clients, and created a dynamic little different from learning that

opposing counsel and a supposedly neutral judge serve as undisclosed colleagues on a college honor board or international tribunal. *See, e.g.*, *In re Kensington*, 368 F.3d at 305.

Equally troubling, that undisclosed relationship gave Andes an unfair leg up. As the parties actively sparred over dozens of issues across years of arbitration, Shore enjoyed invaluable access into Smit's thought processes, insights into his views on particular contract doctrines, and extended opportunities for *ex parte* communications, collegial discussions, and collaboration. *See* JA36-54 ¶¶41-129 (detailing the extensive pre-award proceedings, disputes, and panel rulings throughout the arbitration); *cf. Pac. & Arctic Ry. & Navigation Co. v. United Transp. Union*, 952 F.2d 1144, 1149 (9th Cir. 1991) (vacating award due to *ex parte* contacts that allowed a party to "probe [the arbitrator's] mood and general attitude"). Because the proceedings overlapped with the arbitration here, Shore was able to receive these insights in real time as he worked to convince Smit to award his client more than $500 million. And once Shore was in possession of this information, he had an ethical obligation to use it on behalf of Andes, to OEPC's detriment. *Cf. In re Kensington*, 368 F.3d at 304-05 (advisors to judge could not be neutral because they "had a fiduciary duty" to use their access to advance their clients' interests).

The value of Shore's behind-the-scenes access to Smit cannot be overstated in the context of arbitration, a process that is flexible and highly discretionary.

Unlike a district court judge bound by the Federal Rules, applicable precedent, and the prospect of *de novo* review, arbitrators have virtually "completely free rein to decide the law as well as the facts and are not subject to appellate review" on the merits. *Commonwealth Coatings*, 393 U.S. at 149 (plurality op.). They likewise have near-total discretion in shaping procedures, *e.g.*, *Koch Oil, S.A. v. Transocean Gulf Oil Co.*, 751 F.2d 551, 554 (2d Cir. 1985), determining whether and how to receive evidence, *e.g.*, *LJL 33rd St. Assocs., LLC v. Pitcairn Prop. Inc.*, 725 F.3d 184, 194 (2d Cir. 2013), and crafting remedies, *e.g.*, *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l. Life Co.*, 564 F.3d 81, 86 (2d Cir. 2009). In short, "[i]n arbitration, to a great degree, the arbitrator *is* the process." 3 Ian R. Macneil, et al., *Federal Arbitration Law* §27.1 (1994).

For the same reason that parties expend significant resources researching and selecting arbitrators in the first place, receiving real-time insights into an arbitrator's current procedural preferences, disposition toward particular issues, and amenability to particular strategies can be a major advantage. Smit, as an experienced arbitrator, knew that Shore and Andes were receiving all of these benefits from Shore's extended access, making Smit's failure to disclose "strongly suggestive of bias." *Scandinavian Reinsurance*, 668 F.3d at 72.

The overlapping timeline of the two arbitrations makes the non-disclosure particularly inexcusable. The arbitrations were not active at different times, such

that Smit might have forgotten about one while working on the other. Key events occurred in both arbitrations within days or weeks of each other. For example, the panel in the ICC Arbitration rendered its final award on August 13, 2020. JA584 ¶36. The merits hearing in this arbitration began just two-and-a-half weeks later, on September 1, 2020, with Shore as lead counsel for Andes. JA52-53 ¶118; *compare also* JA584 ¶35 (evidentiary hearing in ICC Arbitration held from October 14-18, 2019), *with* JA47 ¶97 (hearing in OEPC-Andes arbitration held from October 23-24, 2019). On one day, Shore was conferring with Smit as equals about how to apply contract doctrines in the ICC Arbitration; the next day (or so), Shore and his colleagues were preparing contract arguments as non-neutrals before Smit in this arbitration, no doubt using any insights Shore gleaned during the confidential ICC arbitration. Shore was also the chair on the ICC Panel, a relationship that creates additional weight and collegiality.

Making matters worse, Smit *did* disclose less substantial potential conflicts, demonstrating both his understanding of his strict disclosure obligations and creating the illusion of compliance. Before his appointment, Smit disclosed that a different client of Shore's law firm once appointed him as an arbitrator in an unrelated matter. JA535. And when OEPC retained additional counsel during the arbitration, Smit disclosed *for Andes' benefit* that one of OEPC'S new attorneys, David Rivkin, was also appearing before him in an unrelated matter. JA560. The relationships in these

disclosures were far more attenuated than Smit's ongoing relationship with Shore—neither provided direct access to Smit's thought processes or his views on myriad contract doctrines as an equal—and yet Smit properly disclosed them as required by the arbitration agreement. But all the while, for more than *two years* spanning multiple other disclosures and the entire merits proceedings in this arbitration, Smit concealed his far more extensive, consequential, and advantageous relationship with Shore. And Andes and Shore concealed it too.

The second of Smit's disclosures is particularly damning. Rivkin entered his appearance in this arbitration on May 11, 2018. The very next day, Smit disclosed that Rivkin was also appearing before him as a non-neutral in another matter. JA560. Remarkably, Shore had been appointed as Smit's colleague and co-arbitrator in the ICC Arbitration *just two weeks earlier*, on April 25, 2018. JA582 ¶28(e). Thus, while Smit was quick to disclose a relatively trivial potential conflict that did not involve crossed lines between non-neutrals and neutrals *for Andes' benefit*, he inexplicably chose not to disclose a nearly contemporaneous and far more serious relationship that would have provided OEPC with crucial information about his entanglements with Andes' lead counsel. There is no charitable way to explain Smit's differential treatment of these two relationships: He disclosed the more minor one to Andes while concealing the more substantial one from OEPC. By disclosing other relationships while hiding the one relationship with which he knew OEPC was

most concerned, Smit "misled" OEPC "into believing that no nontrivial conflict exist[ed]." *Applied Indus.*, 492 F.3d at 137; *see New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1110 (9th Cir. 2007) (finding evident partiality based on incomplete disclosure); *cf.* William Shakespeare, *Macbeth* act 1, sc. 3 ("The instruments of darkness tell us truths, win us with honest trifles, to betray us in deepest consequence.").

3. Notwithstanding the gravity of Smit and Shore's relationship—to say nothing of their concealment of that relationship in violation of the arbitration agreement—the district court concluded that OEPC had not established evident partiality. In its lone sentence of analysis of the issue, the court stated only that "concurrent service on two panels" does not "establish material partiality," citing *Scandinavian Reinsurance*. SPA6. Had the court conducted the "case-by-case approach" to evident partiality that *Scandinavian Reinsurance* itself requires, 668 F.3d at 72, it would have recognized that this case differs from that one in every way that matters.

First, *Scandinavian Reinsurance* did not involve any crossing of the line that is supposed to divide neutrals from non-neutrals; it involved an arbitrator-arbitrator relationship, not arbitrator-party and arbitrator-counsel relationships. The nondisclosure of concurrent service *by two neutral arbitrators* does not suggest "the possibility of bias for or against a particular arbitrating party" because it does not

favor one party over the other. *Id.* at 75, 77. Similarly, the arbitrators' access to insights about each other's views and preferences does not suggest bias because that information would not redound to either party's benefit. *Id.* at 77. Arbitrator-party and arbitrator-counsel relationships are fundamentally different, as an arbitrator's decision to allow counsel for one side to gain an advantage through close interactions over several months as co-equals compromises neutrality and redounds to the benefit of one party over the other. *See Lucent Techs.*, 379 F.3d at 30 (recognizing distinction between an "undisclosed relationship between arbitrators rather than between an arbitrator and a party"); *Univ. Commons-Urbana*, 304 F.3d at 1341 ("[S]erving as the decision-maker in one action in which a colleague in another action represents a party clearly poses the possibility of bias."). Here, it is undisputed that Smit had a relationship with Andes' lead counsel for years that nobody disclosed to OEPC.

Second, the parties in *Scandinavian Reinsurance* did not include in their agreement any specific framework for impartiality, disclosure, or disqualification. Indeed, this Court expressly qualified that decision by noting that it was "not a case in which the parties have specified a standard for arbitrator impartiality," and it reserved judgment on whether "noncompliance with … an agreed-upon standard" requiring disclosure of an arbitrator-arbitrator relationship "would require a finding of 'evident partiality.'" 668 F.3d at 77 n.22. And this Court has since recognized

44

that "an undisclosed relationship is material if it violates the arbitration agreement." *Lloyds*, 892 F.3d at 510. Here, Smit's non-disclosure violated multiple provisions of the agreement from which he derived his authority, as well as his own repeated promises to comply with those disclosure requirements.

Third, *Scandinavian Reinsurance* turned in part on the fact that the arbitrators disclosed their joint service to the parties in the other arbitration proceeding, which led this Court to conclude that the arbitrators may have mistakenly believed that they had already disclosed the relationship. *Id.* at 77. This record cannot support any *post hoc* attempt to suggest Smit and Shore were laboring under any comparable misconception. Smit has never offered an explanation for his concealment—and because of the truncated nature of the proceedings below, has never been required to do so, *see infra* Part III—and Shore made no claim of inadvertence in the declaration he filed in the district court. Instead, Shore asserted that he "rel[ied] on the International Bar Association's Guidelines," which he claims "expressly 'do not require disclosure'" of the relationship. JA580 ¶¶24-25. That misses the point. The parties contracted to apply the AAA rules. Nowhere did they agree to apply the IBA Guidelines. And Shore does not deny the applicable AAA rules unambiguously required him and Smit to disclose "any … present relationship" they shared. AAA Rule R-17(a). In all events, Shore is not even correct about the standard he unilaterally substituted for the one to which the parties agreed: The IBA Guidelines

required Andesdisclose "any relationship, direct or indirect, between the arbitrator and the party [or] its counsel and the arbitrator … on [his] own initiative at the earliest opportunity." JA647, Rule (7)(a)-(b). His declaration admits he did not. *See* JA521-74.

The district court dismissed these troubling facts with a blithe comment that OEPC "merely speculates about the opportunity to engage in misconduct," SPA6, but that defies logic. It is self-evident that members of an arbitration panel—like members of an appellate panel—communicate with one another *outside* the presence of counsel for the parties. Smit and Shore served on the same arbitration panel for two years, communicating throughout that proceeding outside the presence of OEPC, without OEPC's knowledge or participation. OEPC had no ability to develop additional evidence of misconduct because the relationship was not disclosed during the arbitration as the contract required. The AAA Rules, in fact, squarely prohibit calling arbitrators as witnesses, *see* JA220, Rule R-52(e), making Smit's compliance with his disclosure obligations all the more critical to the parties' arbitration agreement and to the fundamental fairness of the process.

By concluding that OEPC had no recourse for Smit's concealment, the district court rendered the agreement's disclosure requirements toothless and eviscerated the parties' right to arbitrate with the guarantees of independence and neutrality for which they bargained. Arbitration can be a tremendously useful method of dispute

resolution, especially in the context of international transactions in which one party may doubt the neutrality of local judicial systems. But its promised benefits become illusory if negotiated neutrality and disclosure agreements can be disregarded without consequence. Here, Andes' and Smit's disregard for the arbitration agreement's disclosure provisions left OEPC in the same position it sought to avoid by looking to arbitration in the first place: an adjudication before a decisionmaker it could not trust. That violation requires vacating the massive arbitration award issued by a compromised panel. To do otherwise would be to reward a party that manifestly and knowingly violated its own disclosure obligations.

## II. The Arbitration Award Should Be Vacated Because The OEPC-Andes Panel Was Not Composed In Accordance With The Arbitration Agreement.

### A. The Arbitration Award Cannot Be Confirmed Under The Convention.

Smit's failure to disclose in accordance with the arbitration agreement also precludes confirmation under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Convention, widely considered the foundational instrument for international arbitration, applies to arbitration awards "not considered as domestic" by the law of the state where recognition and enforcement is sought. Convention, art. I(1). Chapter 2 of the FAA implements the United States' obligations under the Convention and provides that an award is "not considered as domestic" if (among other things) one of the parties to the award is a foreign

47

corporation. 9 U.S.C. §202; *see CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 70 (2d Cir. 2017). Andes is a foreign corporation, so the Convention applies here.[3] When a party seeks confirmation of an award covered by the Convention, the FAA directs courts to deny confirmation if "one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the … Convention" applies. 9 U.S.C. §207.

One of the Convention's grounds for refusing to enforce an arbitral award is when "[t]he composition of the arbitral authority … was not in accordance with the agreement of the parties." Convention, art. V, §1(d). In other words, when "the parties explicitly settle[] on a form" for panel composition, the "Convention requires that their commitment be respected." *Encyc. Universalis S.A. v. Encyc. Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005) (refusing to confirm award under Convention when two arbitrators failed to comply with contractual provisions regarding selection of third arbitrator). That defense against enforcement "is essentially an issue of contract interpretation, grounded in the language of the agreements between the parties." *Zeiler v. Deitsch*, 500 F.3d 157, 166 (2d Cir. 2007).

---

[3] When the Convention applies, "the FAA and the Convention have overlapping coverage to the extent that they do not conflict." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 20 (2d Cir. 1997); 9 U.S.C. §208.

The Convention's strong protection of contractual panel-selection provisions reflects the reality that, when it comes to international arbitration, panel composition is "[i]n many respects … the most important decision arbitrating parties make." Macneil, *supra*, §27.1. Although much of the appeal of domestic arbitration lies in its efficiency, *see, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011), "the idea behind international arbitration is to provide a neutral forum," *OJSC Ukrnafta v. Carpatsky Petrol. Corp.*, 957 F.3d 487, 502 (5th Cir. 2020), "obviat[ing] the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties," *Scherk*, 417 U.S. at 516; *accord Mitsubishi*, 473 U.S. at 629-30. The Convention rigorously protects the enforceability of contractual requirements connected to a party's consent to a particular arbitrator, including provisions regarding independence, disclosure, and removal. *Tatneft*, 21 F.4th at 838.

If the parties agree that their arbitral panel will be composed of arbitrators who are wholly independent and must comply with specific disclosure requirements, and one of the arbitrators does not comply, then the "composition of the arbitral authority" is not "in accordance with the agreement of the parties," and the Convention precludes confirmation. Convention, art. V, §1(d). In *Tatneft*, for example, the parties' agreement incorporated a separate body of rules that "require an arbitrator to disclose 'any circumstances likely to give rise to justifiable doubts

as to his impartiality or independence.'" 21 F.4th at 838. Applying the Convention, the D.C. Circuit explained that if the arbitrator "failed to disclose" in accordance with the contract—*i.e.*, if he failed to disclose "circumstances creating 'justifiable doubts' about his impartiality"—then the award could not be confirmed because "the 'composition of the arbitral authority' would not have been 'in accordance with the agreement of the parties.'" *Id.*[4]

The Convention required the district court to deny confirmation here. Smit plainly failed to disclose in accordance with the arbitration agreement. The parties agreed that their arbitral panel would be composed of three wholly independent and neutral arbitrators who would disclose "any past or present relationship with the parties or their representatives." JA208, Rule R-17(a). Smit and Shore's concurrent service unambiguously falls within the meaning of "any … present … relationship." Accordingly, Smit had a mandatory obligation to divulge his ongoing relationship with Andes' counsel, Shore, a matter he knew was of profound concern to OEPC. Andes and Shore had an obligation to disclose that relationship too. Their collective failure to make these required disclosures produced an arbitral authority that was not composed "in accordance with the agreement of the parties." *Tatneft*, 21 F.4th at

---

[4] This ground for refusing confirmation under the Convention is distinct from evident partiality under the FAA, as it precludes confirmation even if a reasonable person would not conclude that the violation evinced evident partiality. *See Tatneft*, 21 F.4th at 838.

838.  The parties agreed their arbitral panel would be composed of three neutral arbitrators who would disclose all potential conflicts, but it was not.  Instead, it was composed of two compliant arbitrators and one who disregarded the parties' agreement, disregarded his oath, and concealed a material and ongoing relationship with counsel for one of the parties—all of which was known to Andes throughout the arbitration, while it was concealed from OEPC.

These breaches cascaded to other provisions regulating panel composition.  The nondisclosure effectively nullified the agreement's unambiguous commitment to submit disqualification disputes to the AAA, which in turn nullified OEPC's ability to select a replacement for Smit.  JA190 ¶3(*l*); JA295 ¶18.2.3.12; JA209, Rule R-18(c).  Allowing Smit to effectively determine his own continued service on the panel struck at the core of the conditions underlying the parties' consent to arbitrate under this panel.  *See Pitta*, 806 F.2d at 424; *cf. Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (holding that the participation of a partial judge in an appeal is a structural error).  Taken separately or together, the abrogation of these procedures departed from the arbitral tribunal envisioned by the arbitration agreement.  Smit, Andes, and Shore's shared and individual failures to disclose ensured that "the composition of the arbitral authority … was not in accordance with the agreement."  Convention, art. V, §1(d).

## B.     The Arbitration Award Should Be Vacated Under FAA §10(a)(4).

For essentially the same reasons, Smit "exceeded [his] powers" under the parties' agreement, warranting vacatur under 9 U.S.C. §10(a)(4). Because arbitration is a matter of contract, arbitrators derive their authority entirely from the parties' agreement. *See United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). Arbitrators exceed their authority when they stray from the terms of the parties' agreement. For example, an arbitrator lacks authority to resolve the parties' dispute if he is not appointed in the manner required by the parties' agreement. *Avis Rent A Car Sys., Inc. v. Garage Emps. Union*, 791 F.2d 22, 25 (2d Cir. 1986). Likewise, an arbitrator lacks authority to decide any issues that the parties did not agree to submit to arbitration. *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 140-41 (2d Cir. 2007); *cf. First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (requiring "clear and unmistakable" evidence that parties agreed to submit arbitrability dispute to arbitrator). And an arbitrator lacks authority to issue an award under the agreement if he fails to comply with the agreement's disclosure requirements or other requirements "designed to facilitate the search for an acceptable neutral." *Sphere Drake*, 307 F.3d at 623.

That is precisely what happened here. The parties agreed to submit their dispute to a panel of three neutral arbitrators who would comply with a rigorous regime of disclosure and disqualification, and they expressly stripped the arbitrators

of any authority to "detract from or alter" those requirements. JA190 ¶3(m). Smit's authority to resolve the parties' underlying dispute did not extend to resolving his own qualification to serve; to the contrary, his authority to act in the main dispute was expressly conditioned on his agreement to the *continuing* disclosure requirements imposed on him as an arbitrator, with any disqualification issues prompted by those disclosures to be resolved by a different panel. But rather than honor his agreement to disclose relationships with Andes and Shore and leave disqualification questions to a separate impartial panel, Smit unilaterally exempted himself from complying, concealed his ongoing, material, and lucrative relationship with Andes' lead counsel, and arrogated to himself determinations whether the relationships were material. By failing to honor his disclosure requirements and arrogating to himself the power to resolve questions of disqualification, Smit plainly "exceeded [his] powers." 9 U.S.C. §10(a)(4). The FAA mandated that the district court rigorously *enforce* these contractual limitations; instead, it sanctioned Smith's material breach.[5]

---

[5] The district court's conclusion under §10(a)(4) rested solely on its incorrect statement that OEPC did "not allege that either Smit or the Tribunal strayed from interpretation and application of the agreement." SPA9. To the contrary, OEPC's argument is premised on Smit's breach of his disclosure obligations and circumvention of the contract's disqualification procedures.

## III. In The Alternative, The Court Should Remand For An Evidentiary Hearing Or Discovery.

At a bare minimum, this Court should vacate the district court's judgment and remand for an evidentiary hearing or discovery. Proceedings to confirm an arbitration award are "treated as akin to a motion for summary judgment." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 (2d Cir. 2006).[6] In the specific context of proceedings to confirm an arbitration award, the Eleventh Circuit has explained that confirmation should be denied in favor of an evidentiary hearing when a party has presented "prima facie grounds for vacatur of the arbitration award," which are: "(1) the arbitrator must be aware of the facts comprising a potential conflict; (2) the potential conflict must be one that a reasonable person would recognize; and (3) the arbitrator must fail to disclose the conflict." *Univ. Commons-Urbana*, 304 F.3d at 1341; *see also Sanko S.S. Co. v. Cook Indus., Inc.*, 495 F.2d 1260 (2d Cir. 1973) (remanding for an evidentiary hearing).

---

[6] In opposing Andes' motion to confirm the award, OEPC argued repeatedly that genuine issues of fact precluded confirmation of the award. It filed a "Response To Petitioner's Rule 56.1 Statement Of Undisputed Material Facts," which identified disputed factual issues that it argued precluded confirmation or warranted discovery. It argued in its Motion to Vacate, Dkt.29 at 19-29, and in its Opposition to Andes' Petition to Confirm, that the evidence it provided "raises genuine issues of material fact to show the Award cannot be confirmed," Dkt.35 at 9-10, under either the FAA or the Convention. OEPC also requested oral argument on its motion when the matter was pending before Judge Cote. Less than two weeks after the matter was transferred to him, Judge Hellerstein confirmed the award without argument.

For the reasons detailed above, the undisputed facts show that the award must be vacated under the FAA or denied confirmation under the Convention. At the very least, however, OEPC has established a prima facie case for vacatur. Smit was indisputably aware of both his co-arbitrator relationship with Shore and Shore's role as Andes' lead counsel. Andes never disputed it knew of this relationship. And its lead counsel, Shore, was privy to it. The only party *unknowing* of the relationship was OEPC. Any reasonable person would recognize at least the *potential* for conflict inherent in an arbitrator-party relationship. *See Univ. Commons-Urbana*, 304 F.3d at 1341. And it is undisputed that Smit and Shore failed to disclose this relationship, in violation of their repeated promises to the contrary. At a bare minimum, then, Smit and Shore's unexplained failure to disclose warrants further exploration.

In particular, OEPC (and the reasonable observer from whose perspective evident partiality must be assessed) remains almost entirely in the dark about the scope and nature of Smit-Shore interactions during the confidential ICC Arbitration. Shore's carefully worded declaration insists that his "only" in-person meetings with Smit as part of the ICC Arbitration took place over a five-day period from October 14-18, 2019. JA584 ¶35. He does not provide any further details about those meetings, let alone about the number and nature of other meetings that were not "in-person," other than to acknowledge that the arbitral panel also held "other

meetings … by phone or video conference," an unspecified number of "deliberative lunches," and at least one "tribunal dinner meeting." *Id.*

OEPC is likewise in the dark about the extent of legal overlap between the contractual issues in this arbitration and those in the confidential ICC Arbitration. *See* JA580 ¶23 (acknowledging that ICC Arbitration also involved a contract dispute). The arbitration proceedings here required Smit to opine on almost the full gamut of contract-law doctrines, including contract interpretation, admissibility of extrinsic evidence, implied conditions, mitigation of damages, frustration of purpose, mutual mistake, the implied duty of good faith, damages offsets, and damages calculations. JA35-36 ¶37-39. It is difficult to imagine a contract dispute in the ICC Arbitration would not involve at least some of these doctrines, and to the extent the non-disclosure alone is not enough to demonstrate evident partiality, a reasonable observer would surely want to know the extent to which Shore was privy to inside information about Smit's views on the very doctrines he would later apply in awarding Shore's client half-a-billion dollars.

It is clear beyond cavil that the Smit-Shore interactions went well beyond running into each other at arbitration conferences, but the details of those interactions are still known only by Smit, Shore, and Andes. That alone should suffice to convince a reasonable observer of evident partiality. But if not, further discovery into all these plainly relevant circumstances is necessary.

**IV.   The District Court Awarded Andes Excessive Pre-Judgment Interest.**

Even if this Court affirms the district court's confirmation of the award, it should vacate or reverse the erroneous pre-judgment interest calculation.  Although the district court did not explain why it awarded the $166 million in interest that Andes requested rather than the $132 million that OEPC proposed, its haste in entering judgment suggests it adopted Andes' calculations in full.   But those calculations contained two obvious errors—one legal, one mathematical—that combine to overstate the amount of pre-judgment interest by more than $34 million.

**A.** The district court misapplied the terms of the parties' agreement and, as a result, used the wrong reference point for calculating the pre-judgment interest rate. The arbitration award required OEPC to pay interest on the award at the rate set forth in paragraph 1.4 of the JOA.  JA144 ¶347(c)(i).[7]  Paragraph 1.4 of the JOA, in turn, defines the "Agreed Interest Rate" as follows:

> Agreed Interest Rate means interest compounded on a monthly basis, at the rate per annum equal to the one (1) month term, London Interbank Offered Rate (LIBOR rate) for U.S. dollar deposits … plus five (5%) percentage points, applicable on the first Business Day prior to the due date of payment and thereafter on the first Business Day of each succeeding calendar month.

JA250 ¶1.4.   In other words, it defines the "Agreed Interest Rate" as 5% plus the U.S. 1-month LIBOR rate "applicable on the first Business Day prior to the due date

---

[7] The award also references Clause 3(i) of Exhibit H of the Farmout Agreement, but that clause also points to paragraph 1.4 of the JOA.

of payment." JA250. Thereafter, the rate is recalculated based on the new LIBOR rate "on the first Business Day of each succeeding calendar month." JA250. The award set the due date for payment of the award at "thirty (30) calendar days" after OEPC received Andes' escrow account details. JA144-45 ¶347(d). Andes provided that information to OEPC on March 26, 2021, *see* JA799, making the due date for payment of the award Sunday, April 25, 2021.

Because the due date was a Sunday, the preceding Friday—April 23, 2021—was the "first Business Day prior to the due date of payment" and the date on which the Agreed Interest Rate should be determined under paragraph 1.4 of the JOA. On April 23, 2021, the LIBOR 1-month rate was 0.111000%, JA794 ¶7, resulting in an applicable pre-judgment interest rate of 5.111% from March 4, 2016, through April 23, 2021, with the rate then changing on the first Business Day of the month thereafter, beginning on May 3, 2021. JA250 ¶1.4; *see* JA793-96. As OEPC demonstrated below, that calculation produces a total pre-judgment interest amount of $132,089,357.15. *See* JA793-96.

Andes insists (and the district court apparently agreed) that the "due date of payment" under paragraph 1.4 is not the date on which payment of "the award" was due under the award, but rather is the date on which OEPC purportedly breached the parties' agreement, *i.e.*, March 4, 2016. The contract says nothing of the sort, but relying on that revisionist reading, Andes claimed that the starting interest rate is 5%

plus the 1-month LIBOR rate on March 4, 2016—when, conveniently enough for Andes, interest rates were higher than they were in April 2021. Andes' attempt to conflate the date of the breach and the "due date of payment" contradicts the plain language of the agreement and violates the principle that "the use of different terms in the same agreement … implies that they are to be afforded different meanings." *Chen v. Ins. Co. of the State of Pa.*, 163 N.E.3d 447, 451 (N.Y. 2020). The JOA uses the terms "date of any breach" and "due date of payment" differently in explaining how to calculate the two components of interest. The JOA states that interest starts to accrue on the "date of any breach." JA295 ¶18.2.3.9. But it does not say that the interest *rate* should be calculated by reference to the "date of any breach." Instead, it says that the *rate* should be calculated by reference to "the due date of payment." JA250 ¶1.4. If the parties wanted the "date of any breach" to serve as the reference point for both parts of the interest calculation, then they would have said so. Instead, the parties used different terms in setting reference points for the different parts of the interest calculation, and those two terms must "be afforded different meanings." *Chen*, 163 N.E.3d at 451.

**B.** Andes (and by extension the district court) made an equally fundamental mathematical error. As the spreadsheet it attached to its letter brief revealed, Andes compounded interest based on a 360-day year, but applied that interest every day of the applicable 365-day calendar years. *See* JA795-96 ¶13; JA783. Because the 360-

day convention results in a higher daily interest rate than a 365-day convention, this mixing and matching enabled Andes to overstate the amount of prejudgment interest by approximately $3 million. *See* JA795-96 ¶13. Again, neither Andes nor the district court offered any explanation for this patently incorrect result.

## CONCLUSION

For the foregoing reasons, this Court should reverse. In the alternative, this Court should vacate and remand for an evidentiary hearing or discovery. At a bare minimum, this Court should vacate the district court's award of pre-judgment interest and either render judgment in the correct amount or remand for re-calculation.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
JOHN C. BRINKERHOFF JR.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

*Counsel for Respondent-Appellant*

March 30, 2022

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This brief complies with the type-volume limitation of Local R. 32.1(a)(4)(A) because it contains 13,998 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

March 30, 2022

s/Paul D. Clement
Paul D. Clement

## CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2022, an electronic copy of the foregoing Brief for Appellant was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.


<u>s/Paul D. Clement</u>
Paul D. Clement