# 21-3039-cv

# United States Court of Appeals

### *for the*

# Second Circuit

———◆———

ANDES PETROLEUM ECUADOR LTD.,

*Petitioner-Appellee,*

— v. —

OCCIDENTAL EXPLORATION AND PRODUCTION COMPANY,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PETITIONER-APPELLEE

SCOTT BALBER
CHRISTIAN LEATHLEY
STEVEN JACOBS
LIANG-YING TAN
HERBERT SMITH FREEHILLS
    NEW YORK LLP
*Attorneys for Petitioner-Appellee*
450 Lexington Avenue
New York, New York 10017
(917) 542-7600

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Petitioner-Appellee Andes Petroleum Ecuador Ltd. ("Andes") submits the following:

1. Andes is owned 100% by Andes Petroleum Company Limited ("APC").

2. APC is owned 55% by CNPC International Ltd. ("CNPCI") and 45% by Sinopec Overseas Oil & Gas Limited ("SOOGL").

3. CNPCI is owned 100% by China National Oil and Gas Exploration and Development Corporation ("CNODC"), and CNODC is owned 100% by China National Petroleum Corporation ("CNPC"). CNPC is wholly owned by the State-owned Assets Supervision and Administration Commission of the State Council of the People's Republic of China ("SASAC"). SOOGL is owned 100% by Sinopec International Petroleum Exploration and Production Corporation ("SIPC"), and SIPC is owned: (i) 30% by China Petroleum Corporation ("Sinopec Group"); (ii) 40% by China Chengtong Kechuang Investment Co. Ltd., which is owned 100% by China Chengtong Holdings Group Co. Ltd.; and (iii) 30% by China Reform Yuanbo Investment (Beijing) Co., Ltd., which is owned 100% by China Reform Holdings Co. Ltd. (China). Sinopec Group, China Chengtong Holdings Group Co., Ltd., and China Reform Holdings Co., Ltd. are wholly owned by the SASAC.

i

# TABLE OF CONTENTS

INTRODUCTION......................................................................................................1

COUNTERSTATEMENT OF THE ISSUES ...........................................................4

STATEMENT OF THE CASE....................................................................................4

    I.    Factual Background..........................................................................4

        A.    OEPC Contracted To Pay Andes 40% Of Any Monetary
            Award Recovered From Ecuador, But Upon Recovery,
            Refused To Pay Andes Its Share...............................................4

        B.    Andes Commenced An Arbitration Proceeding Against
            OEPC..........................................................................................6

        C.    Shore And Smit Were Separately Nominated To Serve
            On A Panel In An Unrelated Arbitration, Which Fact
            Was Publicly Available As Of June 2018. ...............................8

        D.    Andes Won The Andes/OEPC Arbitration By
            Unanimous Decision.................................................................11

    II.    Procedural Background ....................................................................12

ARGUMENT .............................................................................................................13

    I.    Neither Smit Nor Shore Violated The AAA Rules Or The
        Parties' Agreements. ........................................................................15

        A.    Nondisclosure Of The Construction Arbitration Did Not
            Violate The Agreements. .........................................................15

        B.    Nondisclosure Of The Construction Arbitration Did Not
            Violate The AAA Rules............................................................17

    II.    OEPC Waived Its Right To Seek To Vacate The Arbitration
        Award By Failing To Raise The Issue During The Andes/OEPC
        Arbitration. ......................................................................................23

    III.    Even If Smit and Shore Were Required to Disclose Their
        Appointments in the Construction Arbitration, Vacatur Would
        Nonetheless Be Unwarranted. .........................................................27

        A.    The Arbitration Award May Not Be Vacated Under 9
            U.S.C. § 10(a)(2) Because OEPC Has Not Demonstrated
            Evident Partiality.....................................................................28

    B.     The Arbitration Award May Not Be Vacated Under 9 U.S.C. § 10(a)(4) Because Smit Did Not Exceed His Authority. ...................................................................35

IV.   Confirmation Is Required Under The New York Convention. ...........35

V.    OEPC Is Not Entitled To Remand For An Evidentiary Hearing Or Discovery. ...................................................................40

VI.   The District Court's Award Of Pre-Judgment Interest Was Proper. ...................................................................44

**CONCLUSION**...................................................................**47**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agility Pub. Warehousing Co. v. Supreme Foodservice GmbH*,
   495 F. App'x 149 (2d Cir. 2012).........................................................36

*Ameriprise Fin. Servs. Inc. v. Brady*,
   325 F. Supp. 3d 219 (D. Mass. 2018)...............................................24

*ANR Coal v. Cogentrix of N.C.*,
   173 F.3d 493 (4th Cir. 1999)............................................................17

*Anthony v. Affiliated Comput. Servs., Inc.*,
   621 F. App'x 49 (2d Cir. 2015).........................................................35

*Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi*,
   492 F.3d 132 (2d Cir. 2007)..............................................................34

*Banco Di Credito Cooperativo di Civitanova Marche e Montecosaro Soc.*
   *Cooperativa v. Small*,
   852 F. App'x 15 (2d Cir. 2021)..........................................................42

*BSH Hausgerate GmbH v. Kamhi*,
   291 F. Supp. 3d 437 (S.D.N.Y. 2018)...............................................36

*Certain Underwriting Members of Lloyds of London v. State of Fl.*,
   892 F.3d 501 (2d Cir. 2018) ....................................................... passim

*CRC Inc. v. Comp. Scis. Corp.*,
   2010 WL 4058152 (S.D.N.Y. Oct. 14, 2010) ...................................32

*D.H. Blair & Co. v. Gottdiener*,
   462 F.3d 95 (2d Cir. 2006) ...................................................... 13, 40

*Glob. Gold Mining LLC v. Caldera Res., Inc.*,
   941 F. Supp. 2d 374 (S.D.N.Y. 2013) ...............................................28

*Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*,
   803 F.3d 144 (3d Cir. 2015) .............................................................24

iv

*Greene v. United States*,
13 F.3d 577 (2d Cir. 1994) ..................................................................41

*ITT Indus., Inc. v. Rayonier, Inc.*,
2005 WL 1744988 (S.D.N.Y. July 20, 2005)................................. 32, 33

*Jock v. Sterling Jewelers Inc.*,
646 F.3d 113 (2d Cir. 2011) .............................................................35

*Kent Bldg. Servs., LLC v. Kessler*,
2018 WL 1322226 (S.D.N.Y. Mar. 14, 2018)....................................13

*Kinek v. Paramount Commc'ns, Inc.*,
22 F.3d 503 (2d Cir. 1994) ..................................................... 44, 45, 46

*LGC Holdings v. Julius Klein Diamonds, LLC*,
238 F. Supp. 3d 452 (S.D.N.Y. 2017)................................................29

*Lucent Techs., Inc., v. Tatung Co.*,
379 F.3d 24 (2d Cir. 2004) ........................................... 23, 40, 41, 43

*Lyeth v. Chrysler Corp.*,
929 F.2d 891 (2d Cir. 1991) .............................................................44

*Matter of Andros Compania Maritima S.A.*,
579 F.2d 691 (2d Cir. 1978) ..................................................... 23, 31, 32

*Merit Ins. Co. v. Leatherby Ins. Co.*,
714 F.2d 673 (7th Cir. 1983) ..................................................... 17, 25

*MLB Props. Inc. v. Corporación de Television y Microonda Rafa, S.A.*,
2020 WL 5518361 (S.D.N.Y. Sep. 14, 2020) ................................. 35, 36

*Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*,
748 F.2d 79 (2d Cir. 1984) ..................................................... 28, 33, 34

*N. River Ins. Co. v. Reins. Corp. of N.Y.*,
1991 WL 73979 (S.D.N.Y. Apr. 26, 1991) ........................................40

*Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*,
164 F. Supp. 3d 457 (S.D.N.Y. 2016)................................................21

*NGC Network Asia, LLC v. PAC Pacific Grp. Int'l, Inc.*,
    511 F. App'x 86 (2d Cir. 2013) ....................................................................... 41, 43

*Ometto v. ASA Bioenergy Holding A.G.*,
    549 F. App'x 41 (2d Cir. 2014) ..........................................................................20

*Pitta v. Hotel Ass'n of N.Y. City, Inc.*,
    806 F.2d 419 (2d Cir. 1986) ..............................................................................34

*Republic of Arg. v. AWG Grp. Ltd.*,
    211 F. Supp. 3d 335 (D.D.C. 2016) ...................................................................18

*Sanko S.S. Co., Ltd. v. Cook Indus., Inc.*,
    495 F.2d 1260 (2d Cir. 1973) ............................................................................44

*Scandinavian Reins. Co. v. Saint Paul Fire & Marine Ins.*,
    688 F.3d 60 (2d Cir. 2012) ........................................................................ passim

*Tatneft v. Ukraine*,
    21 F.4th 829 (D.C. Cir. 2021) ..................................................................... 38, 39

*Tatneft v. Ukraine*,
    2020 WL 4933621 (D.D.C. Aug. 24, 2020) .......................................... 18, 36, 38

*Toroyan v. Barrett*,
    495 F. Supp. 2d 346 (S.D.N.Y. 2007) ......................................................... 24, 27

*Tradiverse Corp. v. Luzar Trading S.A.*,
    2020 WL 8838055 (S.D.N.Y. June 23, 2020) ....................................................43

*Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*,
    304 F.3d 1331 (11th Cir. 2002) ................................................................... 34, 44

*Vantage Deep Water Co. v. Petrobras Am., Inc.*,
    2019 WL 2161037 (S.D. Tex. May 17, 2019) ....................................................37

*Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*,
    737 F.2d 150 (2d Cir. 1984) ..............................................................................45

*Yosemite Ins. Co. v. Nationwide Mutual Ins. Co.*,
    2016 WL 6684246 (S.D.N.Y. Nov. 7, 2016) .....................................................32

*Zurich Am. Ins. Co. v. Team Tankers A.S.*,
   2014 WL 2945803 (S.D.N.Y. June 30, 2014) ................................................. 16, 27

**Statutes**

9 U.S.C. § 10 .................................................................................................. 28

9 U.S.C. § 10(a)(2) ....................................................................................... 28, 37

9 U.S.C. § 10(a)(4) ........................................................................................... 35

**Rules**

AAA Code of Ethics for Arbitrators in Commercial Disputes Canon II(A)(2) ...... 17

AAA Code of Ethics for Arbitrators in Commercial Disputes Canon II(A)(4) ...... 17

AAA Rules R-17 ................................................................................ 15, 16, 17, 19

AAA Rules R-18 ................................................................................................ 21

**Other Authorities**

Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
   Dec. 29, 1970, 21 U.S.T. 2517, Article V(1)(d) ...................................... 36, 37, 38

International Bar Association Guidelines on Conflicts of Interest in
   International Arbitration, General Standard 1 ....................................................... 31

International Bar Association Guidelines on Conflicts of Interest in
   International Arbitration, General Standard 3(a) ........................................... 19, 38

Restatement (Third) of United States Law of International Commercial
   Arbitration § 4.11 .................................................................... 14, 15, 22

# INTRODUCTION

The district court properly held that Appellant Occidental Exploration and Production Company ("OEPC") failed to establish any basis to vacate a $558 million arbitration award rendered against OEPC and in favor of Appellee Andes Petroleum Ecuador Ltd. ("Andes"; together with OEPC, the "Parties"), by a unanimous three-arbitrator tribunal after more than three years of proceedings, a three-day merits hearing, and a comprehensive factual record.  In this appeal, OEPC seeks the extraordinary relief of reversal and vacatur, not based upon any allegation of actual bias or self-interest by the arbitrators, or any claim that the award was somehow legally infirm.  Indeed, OEPC could not make any such allegation in light of the clear evidentiary record that resulted in the decision at issue.  Rather, OEPC seeks to create a strict-liability rule of vacatur in circumstances in which an arbitrator's disclosures are anything short of perfect.  Below, and again on appeal, OEPC predicates its request for vacatur on a single fact—namely, that one of the arbitrators who was a member of the tribunal which rendered the award, Robert Smit, did not disclose that he was serving as an arbitrator on a panel in a wholly unrelated proceeding with Laurence Shore, one of the lawyers representing Andes.  However, under the applicable arbitration rules, Smit had no obligation to disclose that he was serving as an arbitrator in an unrelated proceeding with Shore and, even if it had been preferable that he did, this

Court has routinely rejected nondisclosure of a professional relationship as grounds for vacating an arbitration award, recognizing that disqualification of any arbitrator who had a professional relationship with a party would make it impossible for parties to find qualified arbitrators.

The fact that Smit and Shore were serving together on another arbitration panel was not a "material" relationship as OEPC alleges. It created no conflict and involved no financial interest, falling far short of the materiality threshold recognized by this Circuit. Moreover, OEPC's allegation that this concurrent service was a "shared secret" between Andes and Smit is false. The "secret" was public knowledge, ascertainable through a simple Google search for nearly three years before the award was rendered. It is implausible that none of the twenty-plus lawyers from the three law firms representing OEPC in a $500 million arbitration bothered to perform a simple Google search on their chosen arbitrator, especially if they had entertained even the slightest concern about Smit's impartiality in the arbitration, which they clearly did not. For all the insinuation and speculation offered by OEPC, there is not a shred of evidence showing that Smit lacked independence or was, in any respect, partial to Andes.

Putting aside whether OEPC actually knew or merely should have known that Smit was sitting on another arbitration panel with Shore, Smit had disclosed—in detail—that he and Shore had longstanding professional contacts. That, by

OEPC's admission, did not compromise Smit's independence and impartiality, and OEPC selected Smit with that knowledge. OEPC's claim that it would have later sought to remove Smit from the panel rings hollow in light of its willing appointment of Smit notwithstanding his plainly disclosed contacts with Shore.

Under the Federal Arbitration Act and the New York Convention, the bar to vacate or avoid recognition of an arbitration award based upon an undisclosed relationship is extremely high. To prevail, OEPC would need to provide clear and convincing evidence that a reasonable person, considering all of the circumstances, would have no choice but to conclude that Smit was partial to Andes. Despite submitting hundreds of pages of briefing and declarations to the district court, OEPC presented no evidence, let alone clear and convincing evidence, indicating that Smit was partial. Awards are generally vacated under this standard only if the complaining party proves that an arbitrator failed to disclose a familial relationship or significant financial stake in the arbitration or a party to it. OEPC cannot allege such impropriety here because there was none. The fact that Smit and Shore served on an unrelated arbitral panel is a routine professional contact and was not a "material" relationship as a matter of law or fact, as is evident from the prevailing guidelines on arbitrator disclosure, co-authored by OEPC's own arbitration counsel. Thus, none of the necessary criteria are satisfied, and sour grapes are insufficient grounds for vacatur. Accordingly, this Court should affirm.

## COUNTERSTATEMENT OF THE ISSUES

1.      Whether the arbitration award entered against OEPC should be vacated based solely upon arbitrator Robert Smit omitting to disclose that he was sitting with Andes' counsel on a panel in an unrelated arbitration, despite:  (i) there being no evidence of any partiality or impropriety; (ii) this fact being public knowledge for years prior to the issuance of the arbitration award; and (iii) the arbitration award being a unanimous 3-0 decision.

2.      Whether OEPC is now entitled to discovery regarding Smit's contacts with Andes' counsel, having chosen not to seek discovery in the district court.

3.      Whether the district court acted within its discretion in calculating pre-judgment interest.

## STATEMENT OF THE CASE

### I.      Factual Background

#### A.      OEPC Contracted To Pay Andes 40% Of Any Monetary Award Recovered From Ecuador, But Upon Recovery, Refused To Pay Andes Its Share.

The arbitration award in this case arises from contracts between the Parties relating to hydrocarbon development in the Republic of Ecuador ("Ecuador").  In 2000, the Parties concluded agreements granting Andes a 40% economic interest in OEPC's exploration rights in Block 15 of the Ecuadorian Amazon Region ("Block 15").  (JA29 ¶¶ 13-14.)  The Parties amended those agreements by letter dated

February 22, 2006.  (JA152-55, the "Letter Agreement.")[1]  The Letter Agreement

acknowledges that Ecuador had threatened to terminate OEPC's rights in Block 15,

and stipulates that OEPC would be the "sole" litigant on behalf of both Parties in

any related legal proceedings.  (JA153 ¶ 2(b).)  It further provides that Andes is

entitled to 40% of "any monetary award" OEPC receives from Ecuador.  (JA154 ¶

2(g).)

In May 2006, Ecuador terminated OEPC's rights with respect to Block 15.

(JA31-32 ¶ 21.)  OEPC then commenced an arbitration proceeding against Ecuador

seeking compensation (the "Ecuador Arbitration").  (JA32 ¶ 22.)  Andes supported

OEPC throughout the Ecuador Arbitration, including by paying a 40% share of its

legal fees.  (*Id.* ¶ 23.)  OEPC prevailed and ultimately obtained an award of

$1,061,775,000 plus interest.  (*See* JA34 ¶ 31; JA317-452, the "Final Ecuador

Award.")  Ecuador, OEPC, and OEPC's parent company later entered into a

settlement agreement under which Ecuador paid OEPC and its parent company

$979,699,368.  (JA35 ¶ 33.)  Andes promptly demanded that OEPC pay Andes its

40% share.  (*Id.* ¶ 34.)  OEPC refused, claiming that its contractual obligation to

pay Andes 40% of "any monetary award" received from Ecuador did not apply to

---

[1]  These agreements include the Farmout Agreement dated October 19, 2000
(JA157-76, the "Farmout Agreement") and the Joint Operating Agreement
dated October 31, 2000 (JA244-315, the "JOA"; together with the Farmout
Agreement and the Letter Agreement, the "Agreements").

the Final Ecuador Award or the settlement monies obtained from Ecuador.  (*Id.*)

## B.    Andes Commenced An Arbitration Proceeding Against OEPC.

Andes initiated an arbitration proceeding against OEPC (the "Andes/OEPC Arbitration"), governed by the AAA Commercial Arbitration Rules (the "AAA Rules"), on July 10, 2017.  (JA25-28 ¶¶ 7-10, JA35 ¶ 35.)  Pursuant to the Parties' Agreements, each Party appointed one arbitrator to the three-person arbitral tribunal (the "Tribunal").  (JA189 § 2.)  Andes appointed Richard Ziegler ("Ziegler").[2]  (JA578 ¶ 13, JA587-88.)  At the time of his appointment, Ziegler disclosed that he had previously served as co-counsel with Herbert Smith Freehills LLP ("HSF") (Andes' counsel) in an arbitration.  (JA525.)  OEPC did not object to Ziegler's appointment.  (JA578 ¶ 14, JA598-99.)

OEPC appointed Robert Smit ("Smit").[3]  (JA578 ¶ 15, JA601.)  Prior to his appointment, Smit disclosed to OEPC's lawyers that he had a professional connection with one of Andes' lawyers, Laurence Shore ("Shore").  (JA519-20.)

---

[2]    Ziegler is an experienced arbitrator who was then the Co-Chair of Jenner & Block LLP's international arbitration practice, and had previously been General Counsel at 3M.  (JA590-96.)

[3]    Smit is an experienced arbitrator who was previously Co-Chair for many years of the international arbitration and dispute resolution practice at the law firm Simpson Thacher & Bartlett LLP.  (JA603.)  Smit has also served as chair of the New York City Bar Association International Commercial Disputes Committee, vice-chair of the International Bar Association's Committee on International Arbitration and ADR, and Adjunct Professor of International Arbitration at Columbia Law School.  (JA603-07.)

Smit confirmed that he had "recent[ly]" been "appointed by . . . Larry [Shore]" as an arbitrator in a separate, ongoing case in which Shore was lead counsel, and that he knew Shore "from arbitration conferences."[4] (*Id.*) OEPC nominated Smit with full awareness of these disclosures. In a later disclosure to both Parties, Smit reiterated that he had "been appointed by a party represented by [HSF] . . . in a pending, unrelated investment treaty arbitration . . . ." (JA535.) OEPC remained content with its appointment of Smit. (JA578-79 ¶ 17, JA609-10.)

Ziegler and Smit jointly nominated James Hosking ("Hosking") to serve as chair of the Tribunal.[5] (JA36 ¶ 40.) Prior to his appointment, Hosking disclosed that he and Andes' counsel Christian Leathley ("Leathley") had: (a) worked together in the New York office of the law firm Clifford Chance LLP for two years, primarily on international arbitration matters; and (b) co-taught a seminar at the University of Pennsylvania Law School for approximately five years. (JA558.) Hosking further explained that, at Clifford Chance, he and Leathley were "part of a small team . . . [who] interacted on a fairly regular basis." (JA544.) Despite this close, long-standing relationship between Hosking and Leathley, OEPC did not object to Hosking's appointment. (JA545, JA579 ¶¶ 20-21, JA621-22.)

---

[4] This case, referred to as the "ICL Arbitration" in the Declaration of Laurence Shore dated August 19, 2021, is discussed further therein. (JA578-79 ¶¶ 16-18.)

[5] Hosking is an experienced arbitrator and a founding partner at the law firm Chaffetz Lindsey LLP. (JA612-19.)

### C. Shore And Smit Were Separately Nominated To Serve On A Panel In An Unrelated Arbitration, Which Fact Was Publicly Available As Of June 2018.

On January 10, 2018, Smit was confirmed as a party-appointed arbitrator in a separate, unrelated arbitration (the "Construction Arbitration"). (JA581 ¶ 28(a).) None of the parties involved in the Construction Arbitration were related to Andes or OEPC, and the legal issues raised in the two arbitrations were completely distinct. (JA580 ¶ 23.)

Unlike in the Andes/OEPC Arbitration, the president (*i.e.*, chairperson) of the Construction Arbitration panel was not selected by Smit and the other party-appointed arbitrator. (JA581-82 ¶ 28.) Rather, the president was chosen by the parties from a list of candidates prepared by the Secretariat of the International Court of Arbitration for the International Chamber of Commerce ("ICC").[6] That list included Shore and seven others. (JA582 ¶ 28(c).) The parties ranked the candidates on the list, and Shore received the highest combined ranking. (*Id.* ¶ 28(d).) Through this process, Shore was appointed president of the Construction Arbitration panel on April 25, 2018. (*Id.* ¶ 28(e).) Contrary to OEPC's speculation before the district court (Hellerstein, J.; the "District Court") (JA186-87 ¶ 26), Smit did not appoint—and had no role in appointing—Shore. (JA582 ¶

---

[6] The ICC administered the Construction Arbitration, which was conducted under the ICC Arbitration Rules.

29.) Thus, prior to Shore's appointment, Smit and Shore had no contact in the context of the Construction Arbitration. (*Id.*)

Smit's and Shore's appointments in the Construction Arbitration were publicly disclosed. In June 2018, the identities of all three members of that panel, including Smit and Shore, were published on the ICC's website.[7] (JA583 ¶ 31, JA760.) They were also published on the website "Jus Mundi"—a Westlaw-style subscription database for international arbitration.[8] (JA583 ¶ 33, JA768-69.) Both websites appear within the first five results of a Google search for either "Robert Smit Arbitrator" or "Rob Smit Arbitrator." (JA583 ¶ 32, JA762-66.)

Thus, the "relationship" between Smit and Shore that OEPC alleges was a "secret," was actually public knowledge, and accessible through a simple Google search for nearly three years (*i.e.*, from its publication on the ICC's website in June 2018) prior to issuance of the arbitration award in March 2021. Tellingly, nowhere in OEPC's 100-plus pages of briefing and declarations before the District Court

---

[7] The page is available at https://iccwbo.org/dispute-resolution-services/arbitration/icc-case-information/case-id-00908/.

[8] In the Andes/OEPC Arbitration, OEPC was represented by three large law firms, Debevoise & Plimpton LLP, Three Crowns LLP, and Selendy & Gay PLLC. In addition, OEPC's in-house counsel, Marcia Backus, herself appeared as counsel of record in the Andes/OEPC Arbitration. The portal for the "Jus Mundi" website includes a statement, "TRUSTED BY THE BEST ARBITRATION TEAMS WORLDWIDE," which appears above the logos of several law offices, including Three Crowns LLP. (JA583 ¶ 33, JA771-75.)

did it deny that, at some time before the arbitration award was issued, it performed this simple Google search or otherwise knew that Smit and Shore served together on the Construction Arbitration panel. Notably, nowhere does OEPC definitively state that it or its counsel learned of the Construction Arbitration on any date certain or by any articulated means. If, indeed, OEPC failed to discover these public facts about the Construction Arbitration before the arbitration award was rendered, this would illustrate that the only motivation for OEPC's investigation was its loss in the Andes/OEPC Arbitration, not any belief that Smit acted with "partiality." OEPC does not and cannot allege that Smit displayed any partiality during the proceedings.

Moreover, the record plainly demonstrates that Smit's and Shore's contacts in connection with the Construction Arbitration were entirely proper and solely concerned the Construction Arbitration. That panel met in person only once: for an evidentiary hearing on October 14-18, 2019. (JA584 ¶ 35.) All other panel meetings were telephonic or by video. (*Id.*) Smit and Shore never had a conversation outside the presence of, at minimum, the third member of the panel, who was also copied on all written correspondence involving Smit and Shore. (JA584-85 ¶ 38.) At no point did Smit and Shore ever discuss the Andes/OEPC Arbitration. (JA585 ¶ 39.) The panel rendered its final award on August 13, 2020. (JA584 ¶ 36.)

### D. Andes Won The Andes/OEPC Arbitration By Unanimous Decision.

The merits hearing in the Andes/OEPC Arbitration was held on September 1-3, 2020, virtually.  (JA49-53 ¶ 110-18.)  On March 26, 2021, the Tribunal issued the arbitration award at issue in this appeal, ordering OEPC to pay Andes $391,879,747 plus interest and costs (the "Arbitration Award").  (JA144 ¶ 347(c).)  The Arbitration Award was unanimous, and was based upon the plain meaning of paragraph 2(g) of the Letter Agreement:

> If [OEPC] receives <u>any</u> monetary award from the Government of Ecuador as a result of the Government's actions to enforce caducity and terminate [OEPC]'s contract with respect to Block 15, [OEPC] agrees that [Andes] is entitled to a 40% share in the net amount received . . . .

(JA154) (emphasis added).  Unsurprisingly, and notwithstanding OEPC's insistence that the word "any" means something other than "any," the Tribunal unanimously found that the Final Ecuador Award fell squarely within the ambit of "any monetary award from the Government of Ecuador."  (JA65-66 ¶ 160, JA66-67 ¶ 164, JA83 ¶¶ 190-91.)

The Arbitration Award required OEPC to pay Andes within 30 days of receiving payment instructions, which Andes provided on March 26, 2021.  (JA144-45 ¶ 347(d), JA797.)  OEPC refused, claiming that after the Arbitration Award was issued, it had learned of Smit's and Shore's concurrent service on the Construction Arbitration panel.  (JA508-09.)  OEPC has not explained how it

allegedly learned of the appointments—which had been public for nearly three years—at such a convenient moment, during the thirty-day window following issuance of the Arbitration Award.

## II.    Procedural Background

On May 3, 2021, Andes filed its petition to confirm the Arbitration Award (the "Petition").  (JA9-18.)  OEPC moved to vacate the Arbitration Award on June 24, 2021, and submitted its opposition to the Petition on July 30, 2021.  (ECF (S.D.N.Y.) Nos. 27, 37.)  OEPC did not seek any discovery to support its motion. The Petition and motion to vacate were fully briefed by September 10, 2021.  (ECF (S.D.N.Y.) No. 39.)

On November 15, 2021, the District Court issued an opinion and order confirming the Arbitration Award and denying OEPC's motion to vacate.  (SPA1-9.)  Regarding the central question of whether Smit's and Shore's purported nondisclosure warranted vacatur of the Arbitration Award for evident partiality, the District Court held that OEPC "merely speculates about the opportunity to engage in misconduct, it fails to provide the something 'more' to establish material partiality."  (SPA6.)  Regarding OEPC's claim that Smit "exceeded his powers" by failing to disclose the Construction Arbitration, the District Court denied OEPC's motion to vacate because "the Tribunal decided an issue within the scope of the agreement and offered a colorable justification for the outcome it reached."

(SPA8-9.)  Importantly, the District Court found that OEPC "could have discovered [the Smit/Shore relationship] because in June 2018, at least one publicly-available website had published Smit's and Shore's appointments to the [Construction Arbitration panel]."  (SPA5.)

On December 2, 2021, the District Court entered final judgment in favor of Andes in the amount of $558,577,380.56, plus costs (the "Final Judgment"). (SPA11-12.)  This appeal followed, with OEPC submitting its Appellant's Brief on March 29, 2022.[9]  (ECF (2d Cir.) No. 59, "Brief" or "Br.")

## ARGUMENT

"A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (citation omitted).  "On a motion to vacate an arbitration award under the Federal Arbitration Act, judicial review of the award is severely limited so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Kent Bldg. Servs., LLC v. Kessler*, 2018 WL 1322226, at *2 (S.D.N.Y. Mar. 14, 2018) (internal quotation marks omitted) (quoting *Scandinavian Reins.*

---

[9]  On April 5, 2022, the U.S. Chamber of Commerce ("USCC") submitted an amicus brief in support of OEPC, making virtually identical arguments to those set out in OEPC's Brief.  (ECF (2d Cir.) No. 71, "Amicus Brief" or "Amicus Br.")

*Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012)).

As set forth below, OEPC does not and cannot meet its "very high" burden. *First*, neither Smit nor Shore had any duty under the Parties' Agreements, or under the AAA Rules that governed the Andes/OEPC Arbitration, to disclose their appointments as arbitrators in the Construction Arbitration, particularly given that their professional relationship had already been disclosed. *Second*, OEPC waived any right to seek to vacate the Arbitration Award based upon the Smit/Shore Construction Arbitration appointment because it knew or should have known about it for several years before the issuance of the Arbitration Award and failed to assert any timely objection. *Finally*, even if Smit or Shore should have disclosed the Construction Arbitration, this nondisclosure still does not come close to satisfying the high bar for vacatur under the Federal Arbitration Act (the "FAA"), or to avoid confirmation under the New York Convention. OEPC seeks to collapse the standards for arbitrator disclosure, removal of an arbitrator during an arbitration, and vacatur or non-recognition of an award, to create a strict-liability rule of vacatur where disclosure is anything short of perfect. That is untenable and contrary to the law. In arbitration, "the category of information [that should be] disclosed is much broader than the category of information that can lead to disqualification or, later, to a finding of evident partiality . . . ." Restatement (Third) of U.S. Law of Int'l Comm. Arb. § 4.11 Reporters' Note f(ii) (Proposed

Final Draft 2019).

## I. Neither Smit Nor Shore Violated The AAA Rules Or The Parties' Agreements.

OEPC's appeal rests entirely upon its claim that nondisclosure of the

Construction Arbitration violated the Parties' Agreements and AAA Rule R-17

("Rule R-17"). Neither is true.

### A. Nondisclosure Of The Construction Arbitration Did Not Violate The Agreements.

OEPC spends a considerable portion of its Brief emphasizing the

unremarkable proposition that the FAA requires the Court to consider the parties'

arbitration agreement in determining whether to vacate an award (Br. at 24-31), but

OEPC's claim that the nondisclosure of the Construction Arbitration violated the

Parties' Agreements is baseless. The Agreements are silent as to disclosure,

providing only that "the arbitrator(s) shall be and remain at all times wholly

independent and impartial." (JA189 § 3(c).) Notwithstanding OEPC's conclusory

claims that the Tribunal was "compromised," there is no evidence in the record to

suggest that Smit was partial or not independent.[10] (*See* Br. at 3, 38, 47.) All that

OEPC offers is unsupported speculation about "opportunities for *ex parte*

communications, collegial discussions, and collaboration," but no basis to claim

---

[10] The USCC makes similar baseless claims that "Appellant was placed on an unequal playing field relative to Appellee." (Amicus Br. at 7.)

that any such conduct occurred.[11]  (Br. at 39.)  OEPC did not submit (and could not submit) any evidence to the District Court demonstrating that Smit was anything other than "wholly independent and impartial."[12]

Unable to demonstrate any breach of the express terms of the Agreements, OEPC also argues that Andes breached the AAA Rules.  (*See* Br. at 33, 45.)  Even if true, there is no support for OEPC's position that a violation of arbitral rules incorporated into a contract creates grounds for vacating or refusing to confirm an award.  To the contrary, this Court's precedent is clear that "[a]rbitration rules and code[s] do not have the force of law," and "a violation of arbitration rules . . . is not a ground for vacating an arbitration award."  *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 2014 WL 2945803, at *9 (S.D.N.Y. June 30, 2014) (citations omitted), *aff'd*, 811 F.3d 584 (2d Cir. 2016); *see also infra* Section I(B).[13]

---

[11]  Shore declared under penalty of perjury that no such misconduct occurred, and OEPC has not submitted any evidence to the contrary.  (JA577 ¶ 10, JA583 ¶ 34, JA584-85 ¶¶ 38-39.)  Despite (i) being informed that the allegations were false before the District Court, (ii) proffering no evidence to the contrary, and (iii) choosing not to seek discovery in the District Court, OEPC repeats the same baseless allegations on appeal.

[12]  As set forth *infra* Section III(A), there is no basis to conclude that Smit was evidently partial to Andes, let alone actually partial.

[13]  OEPC relies on the arbitrator's oath signed by Smit, which does not form part of the AAA Rules.  Specifically, the AAA oath upon which OEPC relies to assert that Smit had to provide "ongoing disclosures" does not change that Smit was only required to disclose in accordance with the applicable standard under the FAA (namely, the standard also reflected in Rule R-17).  (*See* Br. at 12-13.)

## B. Nondisclosure Of The Construction Arbitration Did Not Violate The AAA Rules.

In any event, the purported nondisclosure did not violate the AAA Rules. Rule R-17 provides that parties should disclose "circumstance[s] *likely* to give rise to *justifiable* doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives."[14] (JA208 at Rule R-17(a)) (emphasis added). Under the express language of this rule, not every contact between a party's representative and an arbitrator must be disclosed—only those "likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence." (*Id.*)

The AAA Rules do not define the circumstances that are "likely" to give rise

---

[14] Although OEPC also attempts to rely upon the AAA Code of Ethics for Arbitrators, and the AAA guidance urging that arbitrators "err" on the side of disclosure, these canons "do[] not form part of the arbitration rules of the [AAA]" and "do[] not establish new or additional grounds for judicial review of arbitration awards." *ANR Coal v. Cogentrix of N.C.*, 173 F.3d 493, 497 n.2 (4th Cir. 1999) (second alteration in original). In any event, the canons require disclosure of matters that would call "impartiality" or "independence" into question, as well as matters required by applicable rules. *See* AAA Code of Ethics for Arbitrators in Comm. Disputes at Canon II(A)(2), (4). And while they call for "doubts" to be resolved in favor of disclosure, the law remains that a party "is not entitled to the 'complete and unexpurgated business biograph[ies]' of the arbitrators whom the parties have selected." *Scandinavian Reins. Co.*, 668 F.3d at 77–78 (citation omitted); *see also Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 678 (7th Cir. 1983) (making similar observation while interpreting the ABA Code).

to such "justifiable doubt," but guidance on the precise circumstance presented here (for international arbitrations such as this one) is provided by the International Bar Association ("IBA") Guidelines on Conflicts of Interest in International Arbitration (the "IBA Guidelines"), which are "persuasive . . . authority on arbitrator conflicts of interest." *Tatneft v. Ukraine*, 2020 WL 4933621, at *7 (D.D.C. Aug. 24, 2020) (citation and internal quotation marks omitted), *aff'd*, 21 F.4th 829 (D.C. Cir. 2021).[15]  The IBA Guidelines were drafted to "assist parties, practitioners, arbitrators, institutions and courts in dealing with" questions of what should be disclosed under various arbitral rules, such as the AAA Rules, by providing extensive lists of "specific situations[,] [and] indicating whether they warrant disclosure . . . ."  (JA633-34 ¶ 3, JA635 ¶ 6.)

The IBA Guidelines—co-authored by two of OEPC's lead attorneys in the Andes/OEPC Arbitration (David Rivkin and Gaëtan Verhoosel)—expressly "do not require disclosure of the fact that an arbitrator concurrently serves . . . on the

---

[15]  In *Tatneft*, the court cited the IBA Guidelines in holding that an arbitrator's failure to disclose that he accepted an allegedly "prestigious and lucrative appointment" by counsel for one of the parties to act as arbitrator in a separate "major investment arbitration" during the arbitration would not constitute evident partiality.  *Tatneft*, 2020 WL 4933621, at *7; *accord Republic of Arg. v. AWG Grp. Ltd.*, 211 F. Supp. 3d 335, 355 (D.D.C. 2016), *aff'd*, 894 F.3d 327 (D.C. Cir. 2018) (citing the IBA Guidelines in connection with allegations of evident partiality).  *See also infra* Section III(A).

same Arbitral Tribunal . . . with one of the counsel in the current proceedings."[16]

(JA650-51 ¶ 6.)  They provide only that "an arbitrator should assess on a case-by-case basis whether the fact of having *frequently* served as counsel with, or as an arbitrator on, Arbitral Tribunals with another member of the tribunal may create a perceived imbalance within the tribunal."  (*Id.*) (emphasis added).  Smit's and Shore's contacts were anything but "frequent"—Shore only served on a single arbitral panel with Smit, and has appeared before Smit as counsel only in the two arbitrations discussed here.[17]  (JA581 ¶ 26.)

Moreover, Smit had already disclosed that he knew Shore professionally from arbitration conferences and another arbitration.  *Supra* at 6-7.  OEPC was aware of this when it appointed Smit.  OEPC fails to credibly explain why, in light of Smit's acknowledged professional relationship with Shore, Smit's and Shore's

---

[16]  This is not because the IBA Guidelines set out a narrower disclosure obligation than the AAA Rules.  In fact, they set out a broader obligation, but even under that standard, disclosure of the circumstances at issue here was not required.  (*Compare* JA638-39 at General Standard 3(a), *with* JA208 at Rule R-17(a).)

[17]  In an effort to avoid addressing the IBA Guidelines, OEPC asserts that they should be disregarded because the Parties "contracted to apply the AAA Rules."  (Br. at 45.)  In reality, the AAA Rules do not create a newer or stricter standard for arbitrator disclosure—rather, they use the formula applied virtually uniformly in modern arbitration, of requiring disclosure of matters that might give rise to doubts over an arbitrator's "independence" and "impartiality."  The IBA Guidelines embody the current professional consensus on the meaning of these same criteria, using practical, real-world examples.  Thus, here, as in *Tatneft*, the IBA Guidelines are a useful and persuasive source of authority on whether Smit's concurrent service was disclosable.

service in the Construction Arbitration would have created a "perceived imbalance within the tribunal."

In any event, OEPC's contention that it would have challenged Smit had he disclosed this single additional contact with Shore is undermined by OEPC's conduct. OEPC did not challenge any member of the Tribunal despite disclosures regarding:

- Smit's appointment by Shore to a panel in another concurrent arbitration where Shore acted as counsel, and professional contacts with Shore from arbitration conferences;

- Ziegler's service as co-counsel with HSF in a prior arbitration; and

- Hosking's extensive work with Andes' lead counsel Leathley for two years as part of the same international arbitration practice and co-teaching a law school course with him for five years. *See supra* at 6-7.

OEPC's *post-hoc* claim that it nonetheless would have sought to remove Smit from the Tribunal had the Construction Arbitration been disclosed strains credulity.[18]

---

[18] OEPC argues that Smit's disclosure of his relationship with Rivkin renders the nondisclosure of the Smit/Shore co-arbitrator appointment "particularly damning." (Br. at 42.) However, there is no way to know what Smit was thinking at the time, and nowhere does OEPC explain why the disclosures he did make regarding his relationship with Shore did not cause OEPC to assert objections (as OEPC claims it would have asserted had it known about the Construction Arbitration). At worst, "[t]o the extent [Smit] was careless, that carelessness does not rise to the level of willful blindness." *Ometto v. ASA Bioenergy Holding A.G.*, 549 F. App'x 41, 42–43 (2d Cir. 2014) (finding no error in the district court's holding that David Rivkin, as chair of a tribunal, had no reason to believe a nontrivial conflict might exist involving his firm and a party to the arbitration, and thus affirming district court's denial of motion to vacate and confirmation of arbitral award).

OEPC also assumes that if it had challenged Smit's appointment, he "would have been disqualified" from the Tribunal. (*See* Br. at 2.) However, the AAA (not OEPC) would have decided any challenge, and would have required substantial evidence of a lack of independence and impartiality to remove Smit. (*See* JA209 at Rule R-18.) OEPC's contention that Smit would have been removed from the Tribunal had the Construction Arbitration been disclosed—a central premise of its argument—is unsupported by any legal authority or evidence. Indeed, it is pure speculation and contrary to the reality of international arbitration. *See Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 480 (S.D.N.Y. 2016) ("[S]pecialized arbitrators are likely to know one another, and repeated or overlapping service by the same arbitrators in different arbitrations is bound to occur." (citations omitted)), *aff'd*, 675 F. App'x 89 (2d Cir. 2017). "[T]o disqualify any arbitrator who had professional dealings with one of the parties . . . would make it impossible, in some circumstances, to find a qualified arbitrator at all." *Certain Underwriting Members of Lloyds of London v. State of Fl.*, 892 F.3d

501, 508 (2d Cir. 2018) (citations omitted).  Thus, OEPC was denied nothing.[19]

Without any evidence demonstrating Smit's lack of independence or impartiality, OEPC asserts that nondisclosure of Smit's and Shore's service on the Construction Arbitration panel "deprived OEPC of the twin promises of independence and impartiality . . . ."  (Br. at 34-35.)  This is a radical proposition. It would mean that mere service together as arbitrators, if not disclosed, automatically entails *ex parte* communications, bias and a lack of independence and impartiality.  It would create a default rule of strict liability for nondisclosure even where the underlying contact was innocuous (in addition to being a matter of public record), contrary to this Court's jurisprudence and the confidence shown in international arbitration by the FAA's pro-enforcement philosophy.  Such a change of course would signal a profound lack of trust in and skepticism towards international arbitration, contrary to the approach this Court has consistently taken

---

[19]  As discussed further *infra*, even if the Construction Arbitration should have been disclosed, its nondisclosure does not establish evident partiality, so vacatur is still not warranted.  As set out in the Restatement of International Commercial Arbitration, the standard for vacating an award is much different, and narrower, than the standard for disclosure during the appointment process. "[When] a party disappointed in an arbitral award discovers information that an arbitrator arguably should have disclosed, but did not . . . .  [F]ailure to disclose information that is either relevant or was required to be disclosed is not in itself grounds for refusal to recognize or enforce an award.  Instead, the undisclosed information must be such that it could be the basis for a finding of evident partiality."  Restatement (Third) of U.S. Law of Int'l Comm. Arb. § 4.11, Comment f(ii).

over many decades.  Such a proposition is extreme and, if heeded, would jeopardize every arbitration in which an arbitrator's disclosures were short of utterly exhaustive—irrespective of whether the matters in question were likely to give rise to justifiable doubts as to the arbitrator's independence or impartiality.  OEPC advocates for a result unrestrained by the confines of the law, which the District Court properly rejected.

## II. OEPC Waived Its Right To Seek To Vacate The Arbitration Award By Failing To Raise The Issue During The Andes/OEPC Arbitration.

Even if disclosure of the Construction Arbitration was proper, this Court's precedent is clear that an award should not be vacated based upon an "undisclosed" relationship "where the complaining party should have known of the relationship, or could have learned of the relationship just as easily before or during the arbitration rather than after it lost its case."  *Certain Underwriting*, 892 F.3d at 506 (internal quotation marks omitted) (quoting *Lucent Techs., Inc., v. Tatung Co.*, 379 F.3d 24, 28 (2d Cir. 2004)); *see also Matter of Andros Compania Maritima S.A.*, 579 F.2d 691, 702 (2d Cir. 1978) (declining to vacate award where party allegedly learned of the undisclosed facts through an "exhaustive review" of published awards that "could have [been done] just as easily before or during the arbitration rather than after it lost its case").  Similarly here, the District Court found that "with the exercise of due diligence, [OEPC] could have discovered [the

Smit/Shore] relationship[] because in June 2018, at least one publicly-available website had published Smit and Shore's appointments to the ICC panel." (SPA5.)

"To vacate in such circumstances would encourage parties to remain ignorant of (or fail to reveal) easily discoverable potential conflicts until after losing, at which time the conflict could be asserted by the embittered party as a pretext for invalidating the award." *Toroyan v. Barrett*, 495 F. Supp. 2d 346, 352–53 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also Goldman, Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 150 (3d Cir. 2015) ("A party should not be permitted to game the system by rolling the dice on whether to raise the challenge during the proceedings or wait until it loses to seek vacatur on the issue. Nor should a party wait[] until [it] los[es] and then almost immediately beg[i]n scouring the internet for anything that might suggest one arbitrator or another was biased against it.").

OEPC does not even attempt to challenge the District Court's finding that it "could have discovered" Smit's and Shore's appointments in the Construction Arbitration, nor can it deny that the information was posted on the ICC's public website for nearly three years before the issuance of the Arbitration Award. *Supra* at 9. OEPC could have learned of the appointments "by the most basic method of contemporary 'due diligence': a Google search." *Ameriprise Fin. Servs. Inc. v. Brady*, 325 F. Supp. 3d 219, 227 (D. Mass. 2018) (denying motion to vacate award

because "simple diligence before the arbitration decision would have surfaced the public information on which [movant] seeks to proceed to vacatur").

OEPC does not (and cannot) provide any explanation for why it did not know about the Construction Arbitration prior to the Arbitration Award, given that it was publicly available since 2018.[20]  Indeed, the ICC's website appears on the very first page of Google results on a search of Smit's name.[21]  *Supra* at 9. OEPC's arbitration counsel subscribed to a separate database that also includes this information.  *Id.*  There is no doubt that OEPC "could have learned of the relationship just as easily before or during the [Andes/OEPC] [A]rbitration rather than after it lost its case."  *Certain Underwriting*, 892 F.3d at 506.

---

[20]  OEPC's failure was particularly surprising in light of OEPC's lawyers incurring over $5 million in fees and expenses defending the Andes/OEPC Arbitration (as reported in OEPC's costs submission to the Tribunal).  (JA142-43 ¶ 333.)  Even in cases with much less at stake, parties are expected to exercise diligence.  *See Merit Ins. Co.*, 714 F.2d at 683 ("It is true that the disclosure requirements are intended in part to avoid the costs of background investigations.  But this is a $10 million case.  If [the losing party] had been worried about putting its fate into the hands of someone who might be [biased], it would have done more than it did to find out about [the arbitrator].  That it did so little suggests that its fear of a prejudiced panel is a tactical response to having lost the arbitration.").

[21]  OEPC's Brief completely ignores the ICC's website.  The USCC argues that regardless of the public nature of the Construction Arbitration, a party should not have any duty "to continually research its panels' arbitrators."  (Amicus Br. at 25-26.)  But the law is clear that parties *do* have a duty to perform due diligence on their arbitrators, particularly in a large case with sophisticated parties.  *See Merit Ins. Co.*, 714 F.2d at 683.  The USCC's argument to the contrary seeks to undermine decades of jurisprudence.

OEPC does not explain when or how it learned of the Construction Arbitration, despite it being the sole basis for OEPC's appeal. Instead OEPC uses careful wording to avoid revealing the time and provenance of its "discovery," claiming that "shortly after the panel issued [the Arbitration Award], OEPC discovered some startling information." (Br. at 16.) There is no evidence anywhere in the record regarding OEPC's supposed "discovery" of this public fact, and it would be surprising if simple diligence was not conducted by OEPC's army of lawyers to "discover" the Construction Arbitration prior to the rendering of the Arbitration Award, particularly if it had the slightest suspicion of bias.[22] Notwithstanding OEPC's *post-hoc* claim that Smit's contacts with Shore were "of profound concern to OEPC," none of OEPC's arbitration lawyers from three major law firms were willing to say under oath to the District Court that they had any suspicion that Smit was biased.[23] (*See* Br. at 50.)

---

[22] OEPC's theory that Smit and Shore concocted a scheme to "creat[e] the misleading illusion of compliance with [Smit's] obligations" that could have been undone by a simple Google search performed by any of dozens of accomplished lawyers is implausible, indeed, nonsensical. (*See* Br. at 1.)

[23] The USCC urges this Court to "adopt" a new rule that arbitral awards should be vacated under the specific circumstances presented in this case where the "joint service was not discovered until after the arbitration concluded." (Amicus Br. at 14.) Even if the Court were minded to adopt this radical contrivance, the Arbitration Award should still be confirmed because OEPC should have known about the Construction Arbitration years before the Andes/OEPC Arbitration concluded.

OEPC is no more than an "embittered party" improperly invoking Smit's

and Shore's appointments "as a pretext for invalidating the [Arbitration Award]."

*See Toroyan*, 495 F. Supp. 2d at 352–53. This is precisely the sort of bad faith

gamesmanship the law does not permit.

**III. Even If Smit and Shore Were Required to Disclose Their Appointments in the Construction Arbitration, Vacatur Would Nonetheless Be Unwarranted.**

Even if Smit and Shore were required to (but did not) disclose the

Construction Arbitration, vacatur nonetheless would be contrary to Second Circuit

precedent:

> [A] violation of arbitration rules or ethics codes is not a ground for vacating an arbitration award. Arbitration rules and codes do not have the force of law. The FAA specifies limited grounds for setting aside an arbitration award. The FAA makes the grounds for setting aside an arbitrator's award narrower than the grounds for disqualification in the arbitration rules and code. Therefore, arbitration rules and ethics codes are not the proper starting point for an inquiry into an award's validity under section 10 of the FAA. [OEPC] nonetheless attempt[s] to give arbitration rules and ethics codes the force of law by arguing . . . the parties agreed that the arbitration would be conducted in accordance with [AAA Rules]. But parties may not contractually expand a court's authority to vacate an arbitration award beyond the grounds provided in § 10 of the FAA.

*Zurich Am. Ins. Co.*, 2014 WL 2945803, at *9 (internal quotation marks, citations,

and alterations omitted).[24]  The "limited grounds for setting aside an arbitration award" under 9 U.S.C. § 10 that are invoked by OEPC on appeal are where there was "evident partiality," or where the arbitrators "exceeded their powers."[25]  OEPC also argues that confirmation of the Arbitration Award is precluded under the New York Convention.  None of these grounds warrant vacating the Arbitration Award.

### A.   The Arbitration Award May Not Be Vacated Under 9 U.S.C. § 10(a)(2) Because OEPC Has Not Demonstrated Evident Partiality.

Evident partiality under 9 U.S.C. § 10(a)(2) "may be found only 'where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration.'"  *Scandinavian Reins.*, 668 F.3d at 64 (quoting *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984)).  Under this test, an undisclosed matter can only serve as proof of

---

[24]  *See also Certain Underwriting*, 892 F.3d at 506 n.2 (holding that while it would appear an arbitrator "violated . . . ethical codes; and future parties may well be wary of his participation on panels . . . it is well-established that such ethical violations do not compel vacatur of an otherwise-valid arbitration award.  An arbitrator's failure to make a full disclosure may sully his reputation for candor but does not demonstrate evident partiality." (citations and internal quotation marks omitted)); *Glob. Gold Mining LLC v. Caldera Res., Inc.*, 941 F. Supp. 2d 374, 387–88 (S.D.N.Y. 2013) (observing that "Respondent cites no authority for the proposition that a mere violation of the AAA Rules, by itself, provides grounds for vacatur" and declining to vacate the award).

[25]  OEPC made additional arguments to the District Court that the Arbitration Award should be vacated under other subsections of the FAA due to arbitrator corruption, fraud, or undue means, and for arbitrator misconduct.  It speaks volumes that OEPC was quick to accuse Smit of these misdeeds below, but has abandoned those arguments on appeal.

"evident partiality" where it relates to a material, nontrivial relationship with a party. *Id.* at 75 (in ascertaining whether a relationship is material or nontrivial, "a court must focus on the question of how strongly that relationship tends to indicate the possibility of bias in favor of or against one party, and not on how closely that relationship appears to relate to the facts of the arbitration"); *see also Certain Underwriting*, 892 F.3d at 510. Moreover, "the Court is required to give substantial deference to the arbitrators and to carefully parse whether [the movant's] attacks on the award [constitute] legitimate gripes or after-the-fact complaints of losing parties." *LGC Holdings v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 457 (S.D.N.Y. 2017).

This Court "will not vacate arbitration awards for evident partiality when the party opposing the award identifies no direct connection between [the challenged arbitrator] and the outcome of the arbitration." *Certain Underwriting*, 892 F.3d at 507 (internal quotation marks and citations omitted). It is not "appropriate to vacate an award solely because an arbitrator fails to consistently live up to his or her announced standards for disclosure, or to conform in every instance to the parties' respective expectations regarding disclosure." *Scandinavian Reins. Co.*, 668 F.3d at 76–77. "[N]ondisclosure does not by itself constitute evident partiality." *Id.* at 77. "[W]here an undisclosed matter is not suggestive of bias, vacatur based upon that nondisclosure cannot be warranted under an evident-

partiality theory." *Id.* at 73. "The party challenging the award must prove the existence of evident partiality by clear and convincing evidence." *Certain Underwriting*, 892 F.3d at 505 (citations omitted).

OEPC has pointed to nothing—no testimony, no document, nothing in the transcript or Arbitration Award—from which a reasonable person would "have to" conclude that Smit was partial to Andes or that any supposed partiality changed the outcome of the Andes/OEPC Arbitration. Any such allegation would be wholly undermined by the fact that the Arbitration Award was a 3-0 unanimous decision. *Supra* at 11. Smit's vote did not impact the outcome. Nor can OEPC establish, contrary to the express language of the IBA Guidelines, that appointment to a separate panel on an unrelated matter is material. As the District Court correctly concluded:

> Courts find material relationships where arbitrators have undisclosed pecuniary interests or close familial relationships, but "the fact that two arbitrators served together in one arbitration at the same time that they served together in another is [not], without more, evidence that they were predisposed to favor one party over another in either arbitration."

(SPA6 (quoting *Scandinavian Reins.*, 668 F.3d at 74).)

OEPC cites *Certain Underwriting Members of Lloyds of London v. State of Florida*, 892 F.3d 501, 508 (2d Cir. 2018), for the unremarkable proposition that an undisclosed relationship or fact is "material" if it violates the parties' arbitration agreement. (*See* Br. at 27.) In *Lloyds*, for example, the parties agreed that the

arbitrators must be "disinterested." *Certain Underwriting*, 892 F.3d at 510. Thus, this Court held that if an arbitrator "had a personal or financial stake in the outcome of the arbitration," that would be a breach of the parties' agreement and nondisclosure of such fact would be "material." *Id.* OEPC seeks to dramatically expand *Lloyds*, asserting (without authority) that parties can generally "ratchet up" the FAA's "baseline disclosure requirements" by contract. (Br. at 26, 32.) But even if OEPC were correct that parties can generally "ratchet up" the disclosure requirements beyond those imposed by law, OEPC's claim that the Parties did so in this case is false. (*See id.* at 32.) The Agreements say only that the arbitrators must be independent and impartial (thus merely reiterating the fundamental principle discussed in the IBA Guidelines (*see, e.g.*, JA636 at General Standard 1)), and contain nothing else regarding arbitrator qualifications or necessary disclosures. *Supra* at 15. As set forth above, there is no evidence whatsoever that Smit was not independent and impartial, and nothing in the appointment to the Construction Arbitration panel indicates the possibility of bias *in favor of* Andes.

Indeed, this Court has declined to vacate an award based upon nondisclosures far more significant than joint participation on another tribunal. *See, e.g.*, *Andros*, 579 F.2d at 695, 702. In *Andros*, the arbitrator did not disclose that he had served together on nineteen arbitral panels with the president of an entity that acted as brokers and agents for one of the parties, and operated the ship

involved in the arbitration. Nevertheless, this Court did not vacate the award because there was no "clear evidence of impropriety."[26] *Id.* at 702.

OEPC does not cite a single case finding evident partiality in circumstances analogous to those alleged here. Indeed, when a court in this Circuit was presented with a similar (albeit more significant) "relationship" between an arbitrator and counsel for a party in *ITT Industries, Inc. v. Rayonier, Inc.*, it found no basis to vacate the award. 2005 WL 1744988, at *8–9 (S.D.N.Y. July 20, 2005). In *ITT Industries*, the sole arbitrator and counsel for a party had served together on a panel of special judicial referees concurrently with the arbitration, and counsel acknowledged that the two became "friends for life because of this experience."[27]

---

[26] Similarly, in *CRC Inc. v. Computer Sciences Corp.*, the court declined to vacate an award where an arbitrator failed to disclose that his law firm acted as co-counsel with a party's counsel's law firm on a number of occasions, and the arbitrator "earned substantial fees as a result of this relationship." 2010 WL 4058152, at *4 (S.D.N.Y. Oct. 14, 2010). The nondisclosure of a single contact point between Smit and Shore, with no financial component, does not come close to warranting vacatur. *See also Scandinavian Reins. Co.*, 668 F.3d at 70, 74 (declining to vacate an arbitration award where two arbitrators concurrently served on a different arbitration panel, allegedly involving "a common witness, similar disputed issues and contract terms"); *Yosemite Ins. Co. v. Nationwide Mutual Ins. Co.*, 2016 WL 6684246, at *7–8 (S.D.N.Y. Nov. 7, 2016) (declining to vacate an arbitration award where arbitrator failed to disclose that, in a prior arbitration proceeding involving petitioner and allegedly identical contract language, he represented the party adverse to petitioner).

[27] Shore declared under oath that he and Smit did not form any friendship through the Construction Arbitration, have no social relationship, and have had no contact with each other since the Andes/OEPC Arbitration. (JA585 ¶ 40.) OEPC has not submitted any evidence to the contrary.

*Id.* at *5.  The court rejected unsupported speculation that the two had engaged in inappropriate *ex parte* communications (which OEPC presumes *necessarily* occurred between Smit and Shore), observing:

> These professionals have enjoyed long and esteemed careers, necessitating sensitivity and deference to the norms of judging and conflict avoidance.  They understand the rules against *ex parte* discussion.  Such a serious deviation from the norms of professional conduct is not lightly to be assumed.

*Id.* at *8.  So too here—OEPC's self-serving assumption that co-arbitrators necessarily have improper *ex parte* communications is false.  (*See* JA577 ¶ 10, JA584-85 ¶¶ 38-39.)

OEPC invokes this Court's decisions in *Applied Industrial Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi*, 492 F.3d 132 (2d Cir. 2007) and *Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds*, 748 F.2d 79 (2d Cir. 1984), which are plainly distinguishable.  In *Applied*, this Court upheld vacatur of an award where (i) the president of the tribunal failed to disclose that his company generated $275,000 in revenue from the winning party, and (ii) the tribunal's decision was rendered 2-1, with the president casting the deciding vote.  492 F.3d at 135, 139.  Here, Smit has no financial connection to Shore or Andes whatsoever, and the Arbitration Award was a unanimous 3-0 decision.  *Morelite* involved a father-son relationship between an arbitrator and an officer of a union related to one of the parties, and therefore was even more

significant than the undisclosed relationship in *Applied*.[28]  *See Morelite*, 748 F.2d

at 85 (noting that "a list of familial or other relationships that will result in the *per*

*se* vacation of an arbitration award . . . would most likely be very short").[29]  OEPC

does not provide a single other example of an award being vacated in this Circuit

based upon an arbitrator's alleged nondisclosure.[30]  Vacating the Arbitration

Award under § 10(a)(2) on this tenuous, immaterial basis would be contrary to the

law, and deleterious to New York's standing as a seat for international arbitration.

---

[28]  OEPC and the USCC mischaracterize *Morelite* as a case involving nondisclosure.  (*See* Br. at 26, Amicus Br. at 21.)  In that case, the father-son relationship was known, and Morelite moved unsuccessfully in the district court to disqualify the arbitrator.  *Morelite*, 784 F.2d at 81.  The district court ordered the arbitration to proceed, holding that it had no authority to entertain an attack on an arbitrator's partiality until after an award was rendered.  *Id.*  In reversing and remanding with instructions to vacate the award, this Court observed that the lack of precedent involving such a filial relationship was for "the simple reason . . . that arbitrators in similar situations have disqualified themselves rather than risk a charge of partiality."  *Id.* at 84.

[29]  *Pitta v. Hotel Association of New York City, Inc.*, 806 F.2d 419 (2d Cir. 1986), also cited by OEPC, is even further removed.  In that case, the arbitrator was incapable of acting impartially because the subject matter of the arbitration involved his (the arbitrator's) own compensation.  *Id.* at 423–24.  The out-of-circuit cases cited by OEPC and the USCC are similarly distinguishable.  *See, e.g.*, *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1340 (11th Cir. 2002) (remanding to the district court for an evidentiary hearing on alleged evident partiality where the arbitrator in question was participating in a parallel arbitration *as co-counsel* with one of the counsel in the underlying arbitration).

[30]  OEPC simply presupposes Smit's and Shore's relationship is "material," but there is no basis on which to make such claim.  (*See, e.g.*, Br. at 31.)  There is no personal relationship, and no financial connection between Smit and Shore.  *See supra* at 6-7, 33.

Thus, the District Court's decision that OEPC has failed to demonstrate evident partiality should be affirmed.

### B. The Arbitration Award May Not Be Vacated Under 9 U.S.C. § 10(a)(4) Because Smit Did Not Exceed His Authority.

Vacating the Arbitration Award under 9 U.S.C. § 10(a)(4) would be unprecedented. No court in this circuit has ever vacated an arbitration award under this subsection for an arbitrator's failure to make a disclosure. Section 10(a)(4), which the Second Circuit has "consistently accorded 'the narrowest of readings,'" supports vacatur only where an "arbitrator exceeds his authority [] by (1) 'considering issues beyond those the parties have submitted for [his] consideration,' or (2) 'reaching issues clearly prohibited by law or by the terms of the parties' agreement.'" *Anthony v. Affiliated Comput. Servs., Inc.*, 621 F. App'x 49, 50–51 (2d Cir. 2015) (quoting *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011)). There is no claim Smit did either of these things here, as the District Court correctly held. (*See* SPA9 ("[T]he Tribunal decided an issue within the scope of the agreement and offered a colorable justification for the outcome it reached . . . .").)

### IV. Confirmation Is Required Under The New York Convention.

OEPC argues that even if the nondisclosure does not mandate that the Arbitration Award be vacated, it still should not be confirmed. However, "the burden on the party opposing confirmation of [an] award is 'very high.'" *MLB*

*Props. Inc. v. Corporación de Television y Microonda Rafa, S.A.*, 2020 WL 5518361, at *2 (S.D.N.Y. Sep. 14, 2020). "The court 'shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention.'" *Agility Pub. Warehousing Co. v. Supreme Foodservice GmbH*, 495 F. App'x 149, 151 (2d Cir. 2012). "Given the 'strong public policy in favor of international arbitration, review of arbitral awards under the New York Convention is very limited . . . .'" *Id.*

OEPC attempts to repackage its evident partiality theory in the guise of a challenge to confirmation under the New York Convention: that the purported nondisclosure caused the Tribunal not to be properly constituted, citing Article V(1)(d). This argument is baseless—no court has ever declined to confirm an arbitration award under this subsection for an arbitrator's failure to disclose. *See Tatneft*, 2020 WL 4933621, at *6 (respondent "fails to cite a single U.S. case supporting its argument that an arbitrator's failure to disclose an alleged conflict of interest should be addressed under Article V(1)(d) . . . .").

Under Article V(1)(d), OEPC must show that "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ." *BSH Hausgerate GmbH v. Kamhi*, 291 F. Supp. 3d 437, 440 (S.D.N.Y. 2018). While OEPC asserts that the Tribunal was not "duly

constituted," its complaint is actually that, after the Tribunal was constituted, Smit allegedly failed to adhere to the AAA Rules. (Br. at 16.) OEPC cites no authority holding that such conduct after a tribunal is constituted undermines its composition under Article V(1)(d), and indeed it does not. *See Vantage Deep Water Co. v. Petrobras Am., Inc.*, 2019 WL 2161037, at *11 (S.D. Tex. May 17, 2019) (holding Article V(1)(d) inapplicable to allegations that an arbitrator was not "neutral, impartial, and independent" and rejecting a "rehash" of Section 10(a)(2) allegations of evident partiality under Article V(1)(d)), *aff'd*, 966 F.3d 361 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1395 (2021).

Even if Article V(1)(d) did apply to Smit's alleged nondisclosure after his appointment, OEPC's arguments fail for precisely the same reasons as its vacatur contentions. Neither Smit nor Shore had any duty under the Parties' Agreements or under the AAA Rules that governed the Andes/OEPC Arbitration to disclose their appointments as arbitrators in the Construction Arbitration. *See supra* Section I. The Agreements are silent as to disclosure, and provide only that "the arbitrator(s) shall be and remain at all times wholly independent and impartial." (JA189 ¶ 3(c).) And indeed, OEPC has offered no evidence Smit was partial or not independent. Instead, OEPC seeks to conflate an allegedly incomplete post-constitution disclosure with a failure to remain independent and impartial—and thus to impute impropriety in the composition of the Tribunal. This defies reason,

and would upend the deliberately stringent grounds for refusal of enforcement under the New York Convention, including Article V(1)(d). OEPC likewise has failed to demonstrate that the purported nondisclosure violated the AAA Rules incorporated into the Parties' Agreements because concurrent service on a separate tribunal is not a circumstance likely to give rise to *justifiable* doubt as to the arbitrator's impartiality or independence. *Supra* Section I(B). This is why, *inter alia*, the IBA Guidelines expressly do not require disclosure that an arbitrator concurrently serves on the same tribunal with one of the counsel in the current arbitration.[31] (JA580-81 ¶ 25, JA650-51 ¶ 6.)

Although OEPC relies on *Tatneft* to support its argument (*see* Br. at 49-51), that case conclusively rebuts OEPC's point. In *Tatneft*, the respondent, Ukraine, argued on appeal that the district court should have denied enforcement of the arbitral award because one of the arbitrators had failed to disclose that the petitioner's law firm had appointed him to another arbitration panel. *Tatneft v. Ukraine*, 21 F.4th 829, 838 (D.C. Cir. 2021). The parties' agreement incorporated the Rules of the United Nations Commission on International Trade Law ("UNCITRAL"), which, like the AAA Rules, require an arbitrator to disclose "any circumstances likely to give rise to justifiable doubts as to his impartiality or

---

[31] Moreover, as set out above, this is not because the IBA Guidelines have narrower disclosure obligations than the AAA Rules. In fact, they impose broader obligations. *See supra* at 19 n.16.

independence." *Id.* at 838–39.  Applying that standard, the court looked to the IBA Guidelines "as authority on the ethics of international arbitrators" and observed that, although they did not address the specific conduct at issue, they likely did not require disclosure.  *Id.* at 839.  And even if they did, the D.C. Circuit concluded that the appointment did not raise justifiable doubts regarding his impartiality.  *Id.* at 840.  Here, and unlike in *Tatneft* where the IBA Guidelines did not address the specific issue, the IBA Guidelines expressly do not require Smit to disclose his concurrent appointment to an arbitral panel with Shore.

Even if the nondisclosure were somehow a breach of the Agreements, it would not be sufficiently material to avoid confirmation.  "The purpose of [arbitration] agreements [is] to arbitrate.  The object of those agreements is that the parties will arbitrate rather than resolve disputes in court.  The provisions for selection of arbitrators, although not insignificant, are subsidiary to that overriding

purpose."[32]  *N. River Ins. Co. v. Reins. Corp. of N.Y.*, 1991 WL 73979, at *3

(S.D.N.Y. Apr. 26, 1991).

Far more than a "barely colorable justification," there is ample support for a

finding that the Andes/OEPC Arbitration was conducted in accordance with the

Parties' Agreements.  *D.H. Blair & Co.*, 462 F.3d at 110.  Accordingly, this Court

should reject OEPC's arguments and affirm the District Court's judgment

confirming the Arbitration Award.

## V.    OEPC Is Not Entitled To Remand For An Evidentiary Hearing Or Discovery.

OEPC contends, in the alternative, that this Court should vacate the

judgment of the District Court and remand for an evidentiary hearing or discovery.

(*See* Br. at 22-23, 54-56.)  But OEPC waived its right to discovery by failing to

request it from the District Court.  *See Lucent Techs., Inc. v. Tatung Co.*, 379 F.3d

24, 32 (2d Cir. 2004).  In any event, post-award discovery regarding an arbitrator's

---

[32]  As OEPC has admitted, for a breach to be material it must go "to the root of the agreement between the parties" and be "so substantial that it defeats the object of the parties in making the contract."  (ECF (S.D.N.Y.) No. 35 at 18.)  Alleged breach of an arbitral rule not even set out in the Parties' Agreements (which refer only generally to the AAA Rules), cannot conceivably go to the root of the Agreements or defeat the object of contracting.  OEPC asserted in the Andes/OEPC Arbitration that the purpose of the Letter Agreement—out of which that arbitration arose—was to "ensure cooperation between [OEPC and Andes] in order to pursue recovery [from Ecuador] for 100% of their combined Block 15 Interests."  (JA111 ¶ 258.)  This "object of the parties in making the contract" was unaffected by nondisclosure of the Construction Arbitration in a later arbitration between OEPC and Andes.

alleged bias is limited to situations in which "clear evidence of impropriety" has been presented. *See NGC Network Asia, LLC v. PAC Pacific Grp. Int'l, Inc.*, 511 F. App'x 86, 89 (2d Cir. 2013). OEPC has not satisfied this high burden.

*First*, it is well established that an appellate court will not consider an issue raised for the first time on appeal. *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). This principle was applied by this Court to preclude discovery in a near-identical situation in *Lucent Technologies, Inc. v. Tatung Co.*, 379 F.3d 24 (2d Cir. 2004). In that case, the respondent appealed confirmation of an arbitral award on the basis that the award should be vacated because of arbitrator bias. *Id.* at 25. After affirming the district court's decision that the alleged sources of bias did not warrant vacatur, this Court addressed the respondent's argument that it "should at the very least remand to the district court for discovery regarding the contested relationships." *Id.* at 27–28, 32. The Court first observed that "[a]n appellate court will not consider an issue raised for the first time on appeal," *id.* at 32 (internal quotation marks omitted), and then held: "[Respondent] did not ask the district court for discovery regarding the [contested] relationships . . . and we will not now

consider [the respondent's] belated request to us for discovery."[33]  *Id.*  Similarly, here, because OEPC never asked the District Court for permission to take discovery or to hold an evidentiary hearing, it has waived its right to that relief on appeal.

OEPC claims in a footnote that it argued below that genuine issues of fact precluded confirmation of the Arbitration Award, implying that this somehow preserved its right to discovery.  (*See* Br. at 54 n.6.)  This is false and contrary to OEPC's contentions before the District Court.  OEPC repeatedly argued below that it had already adduced all the evidence it needed to vacate the Arbitration Award.  (*See, e.g.*, ECF (S.D.N.Y.) No. 34, at 3-4 (arguing that "[t]he same facts" that precluded confirmation, "and others adduced herein, show that the [Arbitration] Award must be vacated").)  OEPC specifically argued that "what ultimately happened in the undisclosed [Construction A]rbitration . . . does not matter," and that "Smit's evident partiality toward Andes and the materiality of that relationship arose at the moment Smit and Shore were seated together on the [Construction Arbitration] panel as co-arbitrators and chose not to disclose it."  (ECF (S.D.N.Y.)

---

[33]  *See also, e.g.*, *Banco Di Credito Cooperativo di Civitanova Marche e Montecosaro Soc. Cooperativa v. Small*, 852 F. App'x 15, 21 n.4 (2d Cir. 2021) (rejecting the plaintiff's argument "for the first time on appeal that the district court improperly made [an] adverse finding without the benefit of an evidentiary hearing or discovery," holding that such "right is waived when, as here, a party fails to seek such a hearing below").

No. 29, at 24-25 (alterations omitted).)  OEPC even argued that Smit was

"incompetent to testify on this or any other matter" pursuant to the Parties'

Agreements and the AAA Rules.  (*Id.* at 24 n.5.)  Thus, the record reveals that

OEPC not only failed to request permission to take discovery, but actively argued

against it.[34]  As a result, OEPC has waived its right to seek such relief on this

appeal.  *See Lucent Techs., Inc.*, 379 F.3d at 32.

     *Second*, even had OEPC not waived its right to discovery or an evidentiary

hearing, OEPC has not made the requisite substantial showing that such relief is

needed.  "[D]iscovery in a post-arbitration proceeding is available only in limited

circumstances, where relevant and necessary to the determination of an issue raised

by such an application."  *Tradiverse Corp. v. Luzar Trading S.A.*, 2020 WL

8838055, at *1 (S.D.N.Y. June 23, 2020) (internal quotation marks omitted).  Post-

award discovery regarding an arbitrator's alleged bias is limited to situations where

"clear evidence of impropriety" has been presented.  *NGC Network Asia*, 511 F.

App'x at 89; *Lucent Techs., Inc.*, 379 F.3d at 32.  As set out above, OEPC has not

presented *any* evidence of impropriety, let alone "clear evidence of any

impropriety."  Rather, OEPC's belated request for discovery is plainly a last-resort

---

[34]  OEPC also notes that it requested oral argument on its motion to vacate (Br. at
54 n.6); however, OEPC's letter to the District Court requesting oral argument
reveals that it included no request to take discovery or hold an evidentiary
hearing (*see* ECF (S.D.N.Y.) No. 40 at 1).

effort to "engag[e] in a fishing expedition in an attempt to determine if there is some basis, however farfetched, to prosecute a claim of bias."[35] *Lyeth v. Chrysler Corp.*, 929 F.2d 891, 899 (2d Cir. 1991) (internal quotation marks omitted).

In sum, to countenance OEPC's request for remand when OEPC made no request below to take discovery and OEPC has not come forward with clear evidence of impropriety by Smit, would only serve to "frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation . . . ." *Scandinavian Reins. Co.*, 668 F.3d at 71–72 (internal quotation marks omitted).

## VI.    The District Court's Award Of Pre-Judgment Interest Was Proper.

It is well settled that the assessment of pre-judgment interest is committed to the sound discretion of the district court. *See Kinek v. Paramount Commc'ns, Inc.*,

---

[35] OEPC cites *University Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331 (11th Cir. 2002) and *Sanko S.S. Co., Ltd. v. Cook Industries, Inc.*, 495 F.2d 1260 (2d Cir. 1973), to support a remand for an evidentiary hearing. (*See* Br. at 54.)  However, those cases are inapposite because in each case the party alleging bias had sought discovery and/or an evidentiary hearing in the district court. *See Univ. Commons-Urbana*, 304 F.3d at 1336; *Sanko S.S. Co.*, 495 F.2d at 1262.  Further, and contrary to the extensive record placed before the District Court here, the courts in those cases noted the incomplete nature of the record that necessitated an evidentiary hearing. *See Univ. Commons-Urbana*, 304 F.3d at 1345 (remanding for an evidentiary hearing "due to the paucity and incomplete nature of the record before [it]"); *Sanko S.S. Co.*, 495 F.2d at 1263 (remanding for an evidentiary hearing so "the full extent and nature of the relationships at issue may be ascertained").  Here, as OEPC argued, further inquiry into Smit's and Shore's interactions was unnecessary.

22 F.3d 503, 508 (2d Cir. 1994); *see also Waterside Ocean Navigation Co. v. Int'l*

*Navigation Ltd.*, 737 F.2d 150, 153 (2d Cir. 1984).

OEPC does not contest the District Court's decision to award pre-judgment

interest, which is plainly provided for in the Parties' Agreements. Instead, OEPC

argues that the District Court miscalculated the pre-judgment interest rate. The

Parties agreed to apply an "Agreed Interest Rate" as follows:

> **Agreed Interest Rate** means interest compounded on a monthly
> basis, at the rate per annum equal to the one (1) month term, London
> Interbank Offered Rate (LIBOR rate) for U.S. dollar deposits, as
> published by The Wall Street Journal or if not published, then by the
> Financial Times of London, plus five (5%) percentage points,
> *applicable on the first Business Day prior to the due date of payment*
> and thereafter on the first Business Day of each succeeding calendar
> month. If the aforesaid rate is contrary to any applicable usury law,
> the rate of interest to be charged shall be the maximum rate permitted
> by such applicable law.

(JA250 ¶ 1.4) (emphasis added). OEPC argues that the contractual term "due date

of payment" (which determines the applicable LIBOR rate) somehow refers to the

April 2021 due date of payment of the Arbitration Award, rather than the March

2016 date that OEPC's payment was due to Andes under the Agreements.[36] (*See*

---

[36] OEPC's argument stems entirely from the use of different language in
paragraph 18.2.3.9 of the JOA providing that "[t]he award shall include interest
from the date of any breach." (JA295 ¶ 18.2.3.9.) But given that the definition
of "Agreed Interest Rate" has broader applicability, there is no inconsistency
with interpreting the phrase "due date of payment" in paragraph 1.4 and the
phrase "date of any breach" in paragraph 18.2.3.9. to mean the same thing in
this context.

Br. at 58-59.)  But the only reasonable interpretation of the phrase "due date of payment" is the due date of the payment pursuant to the Agreements, which the Tribunal held to be March 4, 2016.  (*See* JA141 ¶¶ 338-40.)  The fact that Andes had to spend years litigating to obtain the Arbitration Award to compel OEPC to live up to its contractual obligations does not mean that the interest rate calculation must be altered.  OEPC's position would result in an illogical approach where the U.S. one-month LIBOR rate in 2021 would be used to calculate the interest rate for amounts that were due as of March 4, 2016.  There is no basis to suggest that the Parties intended to tether the calculation of interest to the LIBOR rate at the random future date that an arbitration award is issued, rather than from the date of the breach of contract.  Accordingly, there is no basis for reducing the amount of the Final Judgment.[37]

---

[37]  OEPC further contends that the District Court improperly adopted Andes' calculation of pre-judgment interest, which utilized an accounting convention that calculated interest based on a 360-day year.  (Br. at 59-60.)  But OEPC has not shown, and cannot show, that the District Court acted outside its broad discretion by using this accounting convention.  *See Kinek*, 22 F.3d at 508 (district court has broad discretion in calculating pre-judgment interest).

## **CONCLUSION**

For the foregoing reasons, the Order and Final Judgment of the District

Court should be affirmed.


Dated:   June 28, 2022
          New York, New York

Respectfully submitted,

HERBERT SMITH FREEHILLS NEW YORK LLP
By: */s/ Scott S. Balber*
Scott S. Balber
Christian Leathley
Steven B. Jacobs
Liang-Ying Tan
450 Lexington Ave, 14th Floor
New York, New York 10017
Tel: (917) 542-7810
Fax: (917) 542-7601
Scott.Balber@hsf.com
Christian.Leathley@hsf.com
Steven.Jacobs@hsf.com
LiangYing.Tan@hsf.com

*Attorneys for Petitioner-Appellee*

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1.     This brief complies with the type-volume limitations of Local R. 32.1(a)(4)(A) because it contains 11,890 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

June 28, 2022

                                        */s/ Scott S. Balber*            
                                        Scott S. Balber